THOMPSON, TRUSTEE, ET AL. *v.* TEXAS MEXICAN RAILWAY CO.

No. 42.   Argued October 9, 1945.—Decided April 29, 1946.

*Robert H. Kelley* argued the cause and filed a brief for petitioners.

*John P. Bullington* argued the cause for respondent. With him on the brief were *M. G. Eckhardt* and *B. D. Tarlton.*

*Solicitor General McGrath, Daniel W. Knowlton* and *Edward M. Reidy* filed a brief for the Interstate Commerce Commission, as *amicus curiae.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Brownsville (The St. Louis, Brownsville and Mexico Railway Co.) and Tex-Mex (The Texas Mexican Railway Co.) are interstate carriers by railroad and subject to the provisions of the Interstate Commerce Act. 24 Stat. 379, 41 Stat. 474, 49 Stat. 543, 54 Stat. 899, 49 U. S. C. § 1. On November 1, 1904, they entered into a written contract whereby, for payment of specified rentals, Tex-Mex granted Brownsville the right to operate its trains over the tracks of Tex-Mex between Robstown and Corpus Christi, Texas, and to make use of terminal facilities of Tex-Mex at Corpus Christi. The contract provided that it was to continue for a term of 50 years from its date unless sooner terminated by the parties. And it contained the following provision, "It is further agreed that this contract may be terminated without giving any reason therefor, by either party, upon giving twelve months notice of such intent to terminate the lease."

In 1933 Brownsville filed its petition for reorganization under § 77 of the Bankruptcy Act.[1] The petition was approved and petitioner Thompson was appointed as trustee in the proceeding. Shortly thereafter the bankruptcy court entered stay orders to which we will later refer. In October 1940 Tex-Mex notified petitioners that it was exercising its right to terminate and cancel the trackage contract, effective twelve months after November 1, 1940. The trustee, however, continued to operate over the Tex-Mex and to use the Tex-Mex facilities after November 1, 1941. Tex-Mex informed him that a charge of $500 per day would be made for the use of these facilities—an amount in excess of the rental under the contract. The trustee refused to pay any rental other than that specified in the contract.

Thereupon this suit was instituted by Tex-Mex in the Texas courts to enjoin Brownsville and its trustee from using the tracks or other facilities without the consent of Tex-Mex and to recover $500 a day damages for such use or alternatively the reasonable value of the use of the property. The trial court overruled pleas to its jurisdiction and tried the case on the merits. It denied an injunction. It held that the 1904 contract had been terminated and awarded Tex-Mex damages in the amount of $184,929.85. The Court of Civil Appeals affirmed.[2] 181 S. W. 2d 895. The Supreme Court of Texas refused an application for a writ of error. The case is here on a petition for a writ of certiorari which we granted because of the importance of the problems in the administration of the Interstate Commerce Act and of the Bankruptcy Act.

---

[1] This petition was filed in the reorganization proceedings of the Missouri Pacific R. Co. which owned about 94 per cent of the voting stock of the New Orleans, Texas and Mexico Ry. Co., which in turn owned all of the voting stock of Brownsville.

[2] No complaint was made on appeal of the denial of an injunction.

138

*First.* It is contended here, as it was in the state court, that the maintenance of the present suit is precluded by the stay orders issued by the bankruptcy court and by § 77 of the Bankruptcy Act.

Sec. 66 of the Judicial Code, 28 U. S. C. § 125, authorizes suits against the trustee, without leave of the bankruptcy court, "in respect of any act or transaction of his in carrying on the business." [3] In *McNulta* v. *Lochridge,* 141 U. S. 327, 332, this statute was said to grant an "unlimited" right "to sue for the acts and transactions" of the estate. Operation of the trains is plainly a part of the trustee's functions. Claims which arise from their operation—whether grade-crossing claims as in *McNulta* v. *Lochridge, supra,* or claims for the use of the tracks of another as in the present case—are claims based on acts of the trustee in conducting the business. Hence this suit, so far as it involves only a money claim against the estate for acts of the trustee in operating trains over respondent's tracks, could be maintained in the state courts against the trustee.[4] And the stay orders entered were wholly consistent with this course.[5]

---

[3] "Every receiver or manager of any property appointed by any court of the United States may be sued in respect of any act or transaction of his in carrying on the business connected with such property, without the previous leave of the court in which such receiver or manager was appointed; but such suit shall be subject to the general equity jurisdiction of the court in which such manager or receiver was appointed so far as the same may be necessary to the ends of justice."

[4] Judgment for damages was granted only against petitioner trustee; judgment for costs was granted against the trustee and Brownsville jointly and severally.

[5] The stay orders authorized the trustee to defend any suits which might be brought.

In view of our disposition of the case it is unnecessary to decide at this time whether or not the suit may also be maintained against Brownsville. The stay order, entered for the benefit of the debtor,

It is argued, however, that this suit cannot be maintained consistently with the provisions of § 77 which grant the reorganization court exclusive jurisdiction over the debtor and its property.[6] The theory is that the suit interferes with the administration of the estate, adjudicates the trustee's interest in property in his possession, and indeed seeks to disrupt the operating schedule of trains. It is clear that the issuance of an injunction against operation of the trains over respondent's tracks would have been an interference with the exclusive jurisdiction of the reorganization court. The fact that no injunction was granted is not a decisive answer. In *Ex parte Baldwin,* 291 U. S. 610, 618, the Court held that the exclusive jurisdiction of the bankruptcy court is determined by the "main purpose" of the suit. In that case suit had been brought in the state courts to have a railroad right of way declared forfeited and in addition to recover damages. The claim for damages was held to be "merely an incident" to the suit for a forfeiture and did not save the suit from the defense that it was of the type which sought to interfere with the exclusive jurisdiction of the bankruptcy court. We do not construe the present

---

followed the provisions of § 77 (j) of the Bankruptcy Act, 49 Stat. 911, 922, 11 U. S. C. § 205 (j) and provided: "That commencement or continuation of suits against any of the debtor companies is hereby stayed and enjoined until after final decree entered in these proceedings, provided, however, that suits or claims for damages caused by the operation of trains, buses, or other means of transportation may be filed and prosecuted to judgment in any court of competent jurisdiction, and any order heretofore staying the prosecution of any such causes of action or appeal is hereby vacated."

[6] Sec. 77 (a) provides in part: "If the petition is so approved, the court in which such order is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located . . ."

bill as having as its main object the stoppage of the movement of petitioner's trains over respondent's tracks. The main purpose of the suit seems to be an attempt on the part of respondent to obtain a more favorable rental.

The fact, however, that respondent's suit does not have as its main purpose the ouster of petitioners from possession is not a complete answer to the plea to the state court's jurisdiction. As *Ex parte Baldwin, supra,* p. 616, held, the exclusive jurisdiction of the bankruptcy court is not limited to protecting the possession of the trustee; it "extends also to the adjudication of questions respecting the title." See *White* v. *Schloerb,* 178 U. S. 542; *Whitney* v. *Wenman,* 198 U. S. 539. Petitioners argue that the present case comes within that principle. It is pointed out that this suit seeks the cancellation of the trackage agreement. It is argued that the rights granted Brownsville under that agreement are property rights; and that a suit to cancel the agreement and collect amounts other than the specified rentals is a suit which interferes with and adjudicates title to the property. If we were dealing here with a lease, a suit to effect its forfeiture could not be maintained in another court without consent of the reorganization court. But the trackage agreement created only a personal obligation and did not purport to grant Brownsville any estate in the property of Tex-Mex. See *Des Moines & Ft. Dodge R. Co.* v. *Wabash, St. L. & P. R. Co.,* 135 U. S. 576, 583; *Union Pacific R. Co.* v. *Chicago, M. & St. P. R. Co.,* 163 U. S. 564, 582–583. It was an executory contract subject to termination on a specified notice. The exclusive jurisdiction of the reorganization court was a barrier to any action by any other court which would disturb the possession of the trustee or interfere in any way with his operation of the business. But, apart from the qualification to which we will later refer, litigation restricted to the amount due under a contract, express or implied, for the

use by the trustee of another's property no more interferes with the administration of the estate than suits to determine his liability under contracts calling for the delivery of coal or other supplies. In each the claim is reduced to judgment and may then be presented to the bankruptcy court for proof and allowance. Cancellation of a contract pursuant to its terms alters, of course, rights and duties of the trustee. But the bankruptcy rule is that he takes the contracts of the debtor subject to their terms and conditions. Contracts adopted by him are assumed *cum onere*.[7] The general rule is (1) that if the other party had a right to terminate the arrangement, that right survives adoption of the contract by the trustee; and (2) that the incidence of termination, except as it interferes with the exclusive jurisdiction of the bankruptcy court, may be litigated in any court where the trustee may be sued. That rule of bankruptcy is applicable to proceedings under § 77 by reason of § 77 (1) which provides:

> "In proceedings under this section and consistent with the provisions thereof, the jurisdiction and powers of the court, the duties of the debtor and the rights and liabilities of creditors, and of all persons with respect to the debtor and its property, shall be the same as if a voluntary petition for adjudication had been filed and a decree of adjudication had been entered on the day when the debtor's petition was filed."

But, as we shall see, the qualification in § 77 (1) that the rule of bankruptcy be "consistent with the provisions" of § 77 made premature an adjudication by the court that the contract was terminated, prior to a determination by the Interstate Commerce Commission that that step was consistent with the reorganization requirements of the debtor.

---

[7] See *Greif Bros. Cooperage Co.* v. *Mullinix,* 264 F. 391, 397; 4 Collier on Bankruptcy (14th ed.) § 70.43.

*Second.* Prior to the rendition of judgment on the merits, the decision of the Interstate Commerce Commission was necessary on two phases of the controversy—one under § 77 of the Bankruptcy Act, the other under provisions of the Interstate Commerce Act.

(1) As we have said, the right to terminate a contract pursuant to its terms survives the bankruptcy of the other contracting party. And that general bankruptcy rule is applicable in § 77 proceedings by reason of § 77 (1), which, as we have said, incorporates into § 77 the rules governing the duties of debtors and the rights and liabilities of creditors so far as they are "consistent with the provisions" of § 77. We have considered the meaning of that qualification in *Smith* v. *Hoboken Railroad, W. & S. C. Co., ante,* p. 123. We there held that a covenant of forfeiture in a lease of railroad tracks and facilities should not be enforced by the bankruptcy court prior to a determination by the Commission that such step would be consistent with the reorganization requirements of the debtor. The Commission has the primary responsibility for formulating plans of reorganization under § 77. See § 77 (d). Forfeiture of leases by the court in advance of a determination by the Commission of the nature of the plan of reorganization which is necessary or desirable for the debtor may seriously interfere with the performance by the Commission of the functions entrusted to it.

We think that the same considerations are applicable to a determination that the trackage agreement in this case should be terminated pending formulation of a reorganization plan. By § 77 (b) the plan of reorganization may adopt or reject executory contracts of the debtor as well as unexpired leases. And the adoption of either an executory contract or of a lease by the trustee does not preclude a rejection of it in the plan. Moreover, trackage agreements, like leases of railroad tracks and facilities, are means by

which railroad systems have been assembled. The retention or the sloughing off of trackage agreements may assume importance in the fashioning of a plan of reorganization by the Commission. The problem is kin to that involved in *Continental Illinois National Bank* v. *Chicago, R. I. & P. R. Co.*, 294 U. S. 648. In that case the Court sustained the power of the reorganization court to enjoin under § 77 creditors, who held collateral notes of the debtor railroad secured by its bonds and bonds of its subsidiaries, from selling the collateral under a power of sale in the notes, where the sale would so hinder, obstruct or delay the plan of reorganization as would likely defeat it. The Court stated (p. 676) that a proceeding under § 77 is a "special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised. And to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile." The Court concluded, in view of the complexity of the problems involved in the reorganization, "that without the maintenance of the *status quo* for a reasonable length of time no satisfactory plan could be worked out." p. 679.

That decision prevented in the interests of a reorganization the enforcement of the provisions of the contracts of the debtor according to their terms. We think like reasons make it important that the *status quo* of this trackage agreement be maintained pending decision by the Commission as to the proper treatment of it in the reorganization plan. The Commission may decide that it should be adopted. Or the Commission may conclude that the trackage agreement should be rejected or that its termination pursuant to its terms should be allowed. These matters involve not only the interests of the two parties to the trackage agreement but phases of the public interest

as well. A court which enforced the termination clause of the agreement pursuant to its terms would be narrowing the choice of the Commission and perhaps embarrassing it in the performance of the functions with which it has been entrusted. For these and like reasons which we have discussed in *Smith* v. *Hoboken Railroad, W. & S. C. Co., ante,* p. 123, we think the court erred in holding that the trackage agreement had been or should be terminated.

(2) The Commission has further functions to perform apart from determining under § 77 whether it would be consistent with the reorganization requirements of the debtor to terminate the trackage agreement.

By § 1 (18) of the Interstate Commerce Act it is provided that "no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment." Carriers being reorganized under § 77 of the Bankruptcy Act are not exempt from that provision. § 77 (o), 11 U. S. C. § 205 (o); *Warren* v. *Palmer,* 310 U. S. 132, 137–138. Whatever may be the powers of the Commission under the Interstate Commerce Act, rather than § 77, over the terms of the trackage agreement (*Abandonment of Chicago, R. I. & P. R. Co.,* 131 I. C. C. 421; *Kansas City Southern R. Co.* v. *Kansas City Terminal R. Co.,* 211 I. C. C. 291), it is clear that the Commission has jurisdiction over the operations. Sec. 1 (18) embraces operations under trackage contracts, as well as other types of operations. See *Chicago & Alton R. Co.* v. *Toledo, P. & W. R. Co.,* 146 I. C. C. 171, 179–181. And the fact that the trackage contract was entered into in 1904 prior to the passage of the Act is immaterial; the provisions of the Act, including § 1 (18), are applicable to contracts made before as well as after its enactment.

See *Louisville & Nashville R. Co.* v. *Mottley,* 219 U. S. 467, 482. Though the contract were terminated pursuant to its terms, a certificate would still be required under § 1 (18). Brownsville or its trustee could, of course, make the application for abandonment of operations. But the fact that they might be content with the existing arrangement and fail or refuse to move does not mean that Tex-Mex would be burdened with a trackage arrangement in perpetuity. Tex-Mex might invoke the Commission's jurisdiction under § 1 (18) and make application for abandonment of operations by Brownsville or its trustee. There is no requirement in § 1 (18) that the application be made by the carrier whose operations are sought to be abandoned. It has been recognized that persons other than carriers "who have a proper interest in the subject matter" may take the initiative.[8] See *Atchison, T. & S. F. R. Co.* v. *Railroad Commission,* 283 U. S. 380, 393–394. An application by a city and county for abandonment of a part of the Colorado & Southern line was indeed entertained. *Colorado & Southern R. Co. Abandonment,* 166 I. C. C. 470. Tex-Mex has even a more immediate interest in the operations over this line. Its property is involved; and the amount being paid for the use of its property is deemed by it insufficient. The Commission is as much concerned with its financial condition as it is with that of Brownsville. Tex-Mex therefore has the standing necessary to invoke § 1 (18).

Tex-Mex, however, points out that in 1941 it made application to the Commission "for authority to cancel track-

---

[8] Cf. *Texas & Pacific R. Co.* v. *Gulf, C. & S. F. R. Co.,* 270 U. S. 266, 273, which holds that a party in interest who is opposed to construction of an extension may not "initiate before the Commission any proceeding concerning the project," his remedy being to appear in opposition if application is made or to seek an injunction under § 1 (20) if no application is made. And see *Powell* v. *United States,* 300 U. S. 276.

age agreements" with Brownsville and that the Secretary of the Commission returned the application saying "The Commission is without authority to consider an application of the nature submitted by you. Its jurisdiction under Section 1 (18) of the Interstate Commerce Act would extend only to abandonment of operation by the St. Louis, Brownsville & Mexico Railway Company." We need not consider whether the application was in proper form for one authorizing and requiring abandonment of operations by Brownsville. In any event, the Secretary of the Commission was without authority to bind the Commission in the matter. Cf. *Minneapolis & St. Louis R. Co.* v. *Peoria & P. U. R. Co.,* 270 U. S. 580, 585.

(3) The jurisdiction of the Commission is not restricted, however, to determining whether or no operations of Brownsville over the tracks of Tex-Mex should be abandoned. Prior to the Transportation Act of 1940 the Commission had some jurisdiction over trackage agreements of the character involved in this case. *Transit Commission* v. *United States,* 289 U. S. 121. But by that Act the Commission received new, explicit powers over trackage rights. Sec. 5 (2) (a) (ii) provides: "It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) . . . for a carrier by railroad to acquire trackage rights over, or joint ownership in or joint use of, any railroad line or lines owned or operated by any other such carrier, and terminals incidental thereto." Trackage rights acquired without the consent and approval of the Commission are unlawful. § 5 (4).

The authority of the Commission under § 5 (2) (a) extends to fixing terms and conditions, including rentals, for any trackage agreements entered into subsequent to the effective date of the Transportation Act of 1940. If, therefore, the two carriers had voluntarily terminated the 1904 trackage contract and had entered into a new one without the approval of the Commission, they would have

violated the Act. There would be no difference in result merely because the trackage contract expired by its terms or was terminated by operation of an escape clause. Until abandonment is authorized, operations must continue. While they continue, trackage rights are being enjoyed. In absence of administrative control, the law would under those circumstances imply a contract for the use of another's property and award reasonable compensation. Thus trackage rights would be acquired on such terms as the court and jury determined. But § 5 (2) (a) vests in the Commission, not the courts, the power to determine the terms and conditions under which trackage rights may be acquired. The jurisdiction of the Commission is exclusive. *Transit Commission* v. *United States, supra.* In that case the Commission had approved a trackage agreement between two carriers and the Court held that the Commission's jurisdiction being exclusive, approval by a state commission was not necessary. The court below thought that case was not controlling here, in view of the fact that the Interstate Commerce Commission had not acted. But in a long line of cases beginning with *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, it has been held that where the reasonableness or legality of the practices of the parties was subject to the administrative authority of the Interstate Commerce Commission, the court should stay its hand until the Commission had passed on the matter. See *General American Tank Car Corp.* v. *El Dorado Terminal Co.,* 308 U. S. 422, and cases cited. That course is singularly appropriate here. It is the function of the Commission to determine the terms and conditions under which trackage rights are acquired. If the parties were allowed to by-pass the Commission and litigate the question in the courts, the power to fix the rental under trackage agreements would be shifted from the Commission to the courts and juries. Moreover, one jury would determine the amount of compensation due

for the period here in question and another jury the amount due for a subsequent period. But a major concern of Congress in dealing with this problem was that neither inadequate rentals nor extortionate nor unreasonable exactions would be made for trackage rights. *Transit Commission* v. *United States, supra,* p. 128. Those questions intimately relate to the financial strength of carriers. And it is one of the Commission's high functions to protect the public interest against unfair or oppressive financial practices which in the past led to such great havoc and disaster. That policy would be undermined if the carriers could repair to courts for determination of the conditions under which trackage rights could be secured. Then jury verdicts or settlements would take the place of the expert and informed judgment of the Commission.

It is suggested, however, that the Commission is empowered to fix the rental only for the future and that it has no power to make an award with retroactive effect. But on this phase of the case we are not dealing with the problem of reparations. In any case where application is made for trackage rights the terms and conditions fixed by the Commission are applicable when the certificate of public convenience and necessity takes effect. If operations do not start until that time, no problem is presented. But frequently there will be applications for renewal of trackage agreements which have expired. Operations may not be discontinued until a certificate of abandonment is obtained. If new trackage rights are granted, they run from the expiration of the old and their terms and conditions are applicable to the full term.[9] Once the Com-

---

[9] The terms and conditions approved by the Commission in *Long Island R. Co. Trackage,* 180 I. C. C. 439, affirmed *Transit Commission* v. *United States,* 289 U. S. 121, were given retroactive effect in that sense.

mission has acted, the court may then proceed to enter judgment in conformity with the terms and conditions specified by the Commission. See *El Dorado Oil Works* v. *United States,* 328 U. S. 12.

It is argued, however, that the trackage rights envisioned by § 5 (2) (a) of the Act are consensual arrangements between the parties; and that the Commission is not granted authority to force a trackage agreement on a carrier. We do not decide what may be the full reach of the power of the Commission under § 5 (2) (a). We are dealing here with an existing operation, not with a case where one carrier seeks to initiate a new one by acquiring the right to run its trains over the tracks of another. The Commission has the power under § 1 (18) to refuse to allow abandonment of the operations. If it so refuses, trackage rights continue to be enjoyed by Brownsville. The question of what would be the amount of a fair rental to be paid by Brownsville would be highly relevant to a decision by the Commission on the issue of abandonment. We conclude that at least in that situation the Commission has the power under § 5 (2) to fix a reasonable rental for the use of the facility by Brownsville regardless of the consent of Tex-Mex.[10] Denial of that power to the Com-

---

[10] The argument is that the Commission has that authority only under § 3 (5) which gives the Commission authority to require the use of terminal facilities including main-line tracks for a reasonable distance outside of the terminal.

Sec. 3 (5) provides: "If the commission finds it to be in the public interest and to be practicable, without substantially impairing the ability of a common carrier by railroad owning or entitled to the enjoyment of terminal facilities to handle its own business, it shall have power by order to require the use of any such terminal facilities, including main-line track or tracks for a reasonable distance outside of such terminal, of any common carrier by railroad, by another such carrier or other such carriers, on such terms and for such compen-

mission is not required by the language of § 5 (2) (a). And this construction of § 5 (2) (a) is in harmony with the power of the Commission under § 1 (18) to refuse to authorize the abandonment of operations. If operations must continue, it is more consistent with this scheme of regulation for the Commission rather than courts or juries to determine the amount of the rental. Any legal, including constitutional, rights of Tex-Mex are protected by the review which Congress has granted the orders of the Commission.

*Third.* If the Commission granted trackage rights, Tex-Mex could then recover judgment, as we have said, for the amount of the rental fixed by the Commission. If, on the other hand, the Commission authorizes the operations to be abandoned, it "may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require." § 1 (20). The Commission could permit abandonment unless Brownsville paid such reasonable compensation for the use of Tex-Mex's property as the Commission should fix.

---

sation as the carriers affected may agree upon, or, in the event of a failure to agree, as the commission may fix as just and reasonable for the use so required, to be ascertained on the principle controlling compensation in condemnation proceedings. Such compensation shall be paid or adequately secured before the enjoyment of the use may be commenced. If under this paragraph the use of such terminal facilities of any carrier is required to be given to another carrier or other carriers, and the carrier whose terminal facilities are required to be so used is not satisfied with the terms fixed for such use, or if the amount of compensation so fixed is not duly and promptly paid, the carrier whose terminal facilities have thus been required to be given to another carrier or other carriers shall be entitled to recover, by suit or action against such other carrier or carriers, proper damages for any injuries sustained by it as the result of compliance with such requirement, or just compensation for such use, or both, as the case may be."

In that case, too, the court would have an administrative finding as a guide to the judgment it would enter. In case abandonment were authorized without more, respondent would then be free to move in this proceeding for judgment and to apply to the bankruptcy court for compliance with the Commission's order. In all those situations suits to recover the amounts due for use of the tracks of Tex-Mex could be maintained in the state court [11] under the principles announced in *Central New England R. Co.* v. *Boston & Albany R. Co.*, 279 U. S. 415, 420. If, however, the Commission decided that the trackage agreement should be dealt with in the plan, the state court would not have power to proceed further. For respondent's rights would be protected by the provisions of the plan which may be reviewed only by the reorganization court. § 77 (e).

Thus, however the case may be viewed, the court below should have stayed its hand and remitted the parties to the Commission for a determination of the administrative phases of the questions involved. Until that determination is had, it cannot be known with certainty what issues for judicial decision will emerge. Until that time, judicial action is premature. The judgment will be reversed and the cause remanded so that the case may be held pending the conclusion of appropriate administrative proceedings.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

---

[11] If the order of the Commission were challenged, its review could of course be had only in the manner provided by statute. See *El Dorado Oil Works* v. *United States,* 328 U. S. 12.