**In re LONG ISLAND R. CO.**

**No. 47970.**

United States District Court
E. D. New York.

July 9, 1953.

Richard R. Bongartz and Henry I. Stimson, New York City, for trustee, William Wyer.

William W. Golub and Thomas L. Howe, New York City, for Long Island Transit Authority.

Conboy, Hewitt, O'Brien & Boardman, New York City, for American Contract & Trust Co. and Pennsylvania R. Co., by Bernard Sobol, New York City, of counsel.

G. Burchard Smith, County Atty., Mineola, N. Y., for Nassau County, by Orrin G. Judd, Sp. Counsel, and Earle K. Moore, New York City, of counsel.

Robert P. Schur, New York City, for Suffolk County.

Nathaniel L. Goldstein, Atty. Gen., for the State, by Abe Wagman, New York City, of counsel.

Denis M. Hurley, Corp. Counsel, New York City, for City of New York, by Francis I. Howley, New York City, of counsel.

Milbank, Tweed, Hope & Hadley, New York City, for Chase Nat. Bank, by Orville W. Wood, New York City, of counsel.

BYERS, District Judge.

On May 23, 1953 the trustee filed and served upon all parties to this proceeding a petition to approve a settlement of sundry taxes assessed by the City of New York since the filing of the petition by the debtor on March 2, 1949 to May 1, 1953, amounting to $14,513,863.36. Of this total there had been paid previously $5,722,409.-21.

Answers in opposition were served and filed on behalf of Nassau County on June 1, 1953 and of Suffolk County on June 4, 1953, which were supplemented by oral argument and written briefs.

Opposition to the petition was also presented by way of testimony, oral argument and printed brief on the part of The Long Island Transit Authority; also by oral argument on the part of the State of New York.

Hearings have been held in open court on June 1, June 15, June 17, June 23 and July 2.

The funds necessary to finance the proposed settlement have become available to the trustee as the result of the acquisition by the City of New York of the Rockaway lines of the debtor, in the sum of $8,-500,000, which transaction has heretofore been sanctioned by this Court and the Interstate Commerce Commission.

It is customary to think of the obligation to pay taxes as one of the primary duties of citizenship, and the striking anomoly confronting the Court arises from the opposition to the performance of that duty offered by the State of New York directly through the Attorney General, and indirectly through The Long Island Transit Authority, which is a state agency; and also by the Counties of Nassau and Suffolk.

The Judicial Code, etc., contains the following pertinent provisions, Tit. 28 U.S.C. § 959(b) and § 960:

"(b) A trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof."

"§ 960.  *Tax liability*

"Any officers and agents conducting any business under authority of a United States court shall be subject to all Federal, State and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation."

The opposition to the performance of this public duty rests upon arguments which have been earnestly and skillfully presented, and therefore invite appropriate discussion.

The total tax liability as above stated, as of May 1, 1953 of $14,513,863.36, computed so as to include so much as was unpaid of the first half of 1948–1949 taxes, included real estate and special franchise taxes in the total principal sum of $12,867,-529.43 and interest of $1,646,333,93.

The foregoing figures have not been challenged by counsel who oppose the granting of the petition.

Of the total taxes so assessed by the City as stated, there had been paid prior to May 22, 1953 the sum of $5,738,298.70, leaving $8,775,564.66 plus interest from May 2, 1953 to May 22, 1953, the date of the proposed settlement agreement, of $15,889.49, or $8,791,464.15 as the sum in dispute between the City and the debtor. As to so much of that figure as represented taxes assessed against real estate, many certiorari proceedings instituted by the trustee were pending, so that a legal basis was present for amicable adjustment of all tax controversies.

The proposal is to authorize the trustee to pay $2,046,831.14 for that purpose, thus effecting a saving to the estate of the debtor of $6,744,623.01 according to the books.

■ As part of the proposed settlement, the City exacted a down payment of $5,471,574, which was made on May 22, 1953, and that fact is in part relied upon to sustain the opposition to the petition, on the theory that pro tanto the Court has been short-circuited in the performance of its duty to pass upon the wisdom and expediency of the entire settlement.

I do not subscribe to that view: The City is a party to this proceeding as a secured creditor and is therefore subject to the jurisdiction of the Court, and it is not to be anticipated that it would demean itself otherwise, should the occasion be deemed appropriate to order a return of the said payment on account; moreover, actual knowledge of the necessity for securing the approval of the Court to effectuate the settlement is attributable to the authorities who acted for the City. The matter is thus to be disposed of without reference to that aspect of the transaction.

The trustee testified that the reduction of the annual charges against the estate for interest and penalties which will result from this proposed settlement will be, on the basis of 1953 charges, the sum of $914,106 per year.

The trustee states the upshot of the matter to be that considering the amounts already advanced as above stated, and the amount now proposed to be added thereto, he will be paying approximately 52% of all of the real estate and special franchise taxes levied by the City of New York since the filing of the petition.

The trustee also stated on the witness stand, and has followed up that testimony by written offers, that he is prepared to negotiate a settlement of tax arrears with Nassau and Suffolk Counties substantially according to the same formula which underlies the pending proposed settlement; he has thus testified that the debtor is in the position to settle tax liabilities with these counties upon a parity with the City, thereby assuring equality of treatment among creditors of the same class.

With this portrayal of the general situation concerning which, according to present understanding, there are no contested issues of fact, it is required to consider the various arguments which have been advanced in the effort to persuade the Court that the application of the trustee should be denied:

■ *First:* The trustee should not be permitted to reimburse himself in part out of the proceeds of the sale of the Rockaway lines, for capital expenditures made by him since he took office.

The trustee has testified that he has not on hand sufficient general funds to pay the said $2,046,831.14, but he proposes to reimburse his general funds from the proceeds of the sale of the Rockaway lines to the required extent, in view of the total expenditures for additions and betterments which have been incurred since March 2, 1949 as shown in detail by a statement attached to the petition, of $11,338,464.

These figures have not been challenged and are therefore accepted. Of the total, $4,906,858 represents speed control devices (recommended as the result of two disasters), and $4,662,818 represents expenditures for additions and betterments to the physical properties. Payments on account of equipment trust certificates and conditional sales agreements amount to $3,642,583. Deductions from that sum totalling $1,873,793 leave the net outlay as stated of $11,338,464.

These figures must be taken into consideration in weighing the argument that the

trustee has not been sufficiently aware of the necessity for physical rehabilitation of the plant and rolling stock of the debtor to justify the Court in approving the desired tax settlement.

It is unnecessary to rehearse all that was said on the witness stand of what was described as the attitude of the Court touching the use of the expected proceeds at the time that the sale of the Rockaway lines was authorized, because there is probably room for difference of opinion on the subject; however the terms of Order No. 138, dated June 27, 1952, should dispel misunderstanding on the subject. For convenience, Paragraph 5 will be quoted:

"That:

"(a) the net proceeds from the sale of the Rockaway lines * * * may be applied and used by the Trustee in defraying the cost of (or in reimbursing the general funds of the estate of the Debtor for the cost of, or in repaying loans made by the Trustee to provide funds to cover the cost of) capital items incurred during the course of the proceedings in the Court for the reorganization of the Debtor, including additions and betterments to the property of the Debtor and other capital items (such as the equity in equipment arising from payments of principal installments on equipment trust certificates and conditional sale contracts) * * *."

The foregoing in terms authorizes the application of the proceeds of this sale for reimbursement to the general funds of the estate for the cost of capital items such as those set forth in the statement attached to the trustee's petition.

The necessity for the adoption of a so-called safety program was broadly recognized for reasons which need not now be discussed, and that program was adopted and paid for out of earnings and without the necessity of borrowing funds, although financial commitments for that purpose had been arranged.

Supplementing that program, rehabilitation of rolling stock and replacement in part mostly of passenger cars, was undertaken and has been carried forward in substantial volume. It is known to the Court by observation that the trustee has made commendable progress in this necessary step toward reconstitution of the physical properties of the debtor.

Passenger car studies have been made, and since the necessity for improvement in that important department is more clearly to be discerned than the precise form in which it should be expressed is agreed upon, it is not to be wondered at that a certain difference of opinion has arisen as to just what type and construction of car should be adopted. The trustee, whose experience has been demonstrated in the operation of other railroad properties, did not agree with the recommendations of a report made by Mr. Dougherty, an engineer, which had been made to the trustee's predecessor.

Without discussing the matter in detail, it is the present opinion that the trustee has carried forward a well-conceived plan in this behalf, including almost complete substitution of Diesel engines for steam locomotives, and should be permitted to continue in his chosen way, subject to seasonable and reasonable challenge in open court, upon notice from time to time, by parties to this proceeding.

It may not be inappropriate to observe that his efforts have been somewhat hampered by acts of vandalism practiced by the traveling public, according to reliable reports which, it is true however, do not constitute part of this record.

There has been some argument over the method employed by the trustee in setting up a depreciation account, but he explained that the term "accrued depreciation" means so much of this theoretical item as the annual earnings permit him so to designate. There has been no attempt to controvert his statement that the item of depreciation as set forth in his accounting procedure is in accordance with the requirements of the Interstate Commerce Commission.

A brief general observation concerning The Long Island Rail Road is deemed to be pertinent:

The problem of the trustee is not to equip this railroad to meet the competition of other railroads, as was the case of the In re

Denver & Rio Grande Railroad Co., D.C., 23 F.Supp. 298, but of motor trucks and private automobiles. The haulage of freight in trucks would of course not be influenced by the kind of passenger cars operated on this railroad; and the extent to which those who prefer to travel in private cars may be influenced to patronize the debtor, if better passenger cars were to be provided, is perhaps debatable; certainly however the convenience and the comfort of the traveling public are calculated to mitigate the preference for long-distance travel by private automobile; in other words, whether the traveling habits of many residents of Long Island will be influenced by a change and improvement in railway passenger cars probably depends on future conditions not clearly to be foreseen. A much greater impact upon those habits would result from such a gasoline shortage as existed during recent war years.

This railroad carried 76,392,206 passengers during the year 1952 which indicates a monthly average of 6,336,017 according to reports filed with the Interstate Commerce Commission.

The estimate of daily passenger traffic is 270,000, the far greater number of whom are commuters.

It is to this task that the trustee and his subordinates have brought to bear a commendable record of accomplishment.

*Second:* It is urged with impressive sincerity by two members of The Long Island Transit Authority who paid this Court the compliment of personally participating in the hearings and arguments, that if the settlement as negotiated by the trustee is to be approved, the plan of reorganization filed by the Authority with the Interstate Commerce Commission will have to be abandoned since one of its essential provisions is a funding of all existing tax liabilities for a period of twenty years at 3% interest; it is said that the entire proceeds of the sale of the Rockaway lines, according to the trustee's petition, will be absorbed and rendered unavailable for that physical improvement of the railroad which the Authority envisages, and which would facilitate the virtual receivership which the Au-

thority seeks to provide, looking to the eventual turning over by it of the entire property to private ownership. Clearly private ownership and operation is a consummation devoutly to be wished, for most thoughtful people profoundly distrust state ownership and operation, with all the extravagant and inefficient incidents thereof.

An examination of the plan as so filed by the Authority (as to which it is not here intended to offer other than a scant and inadequate reference), discloses that in addition to the foregoing purpose, it also contains what I venture to say is the most constructive and acute suggestion which could be presented, namely, that future taxes should be collected on a contingent basis out of net earnings. Such a concept, through enabling legislation, is probably requisite to any eventual rehabilitation and successful operation of this carrier, in view of the many problems which are peculiar to its design and function; those idiosyncracies are to be traced to the history of the Long Island Rail Road, eccentricities in the development of the territory it serves, and the extent also to which public funds have promoted means for diverting passenger and freight traffic to motor transport. Perhaps an awareness of these realities has led the State to enact the laws under which the Authority has been constituted and is prepared to function.

The funding of taxes is not seen to be an imperative aspect of the Authority's plan when it is realized that the effect of granting the petitioner's application will be to reduce the tax lien secured indebtedness of the debtor by $6,744,623, which cannot be viewed as other than a constructive achievement in its financial condition.

In this connection it is urged for the Authority that it is not to be supposed that the 20-year funding contemplated by its plan would necessarily mean the payment of taxes and penalties as accrued at May 1, 1953 at a 3% interest, for the reason that the Authority could be expected to negotiate a substantial reduction in the present figures. Therefore, the amount of this funded tax debt cannot be presumed to be $8,791,454 although that is the figure

at which it is now stated on the tax records of the City of New York.

In order to yield to this argument, the Court would have to indulge in conjecture as to the extent to which a reduction could be effected at the instance of the Authority and how it would compare with the results already achieved by the trustee, and that is a form of speculation which is not presently attractive. The present saving possesses the virtue of certainty.

Moreover, I venture to believe that further reflection and study on the part of the Authority will indicate that its plan need not be abandoned because of any action that the Court may take in connection with this petition, because a plan of reorganization necessarily is subject to revision by the proposer and by the reviewing authorities, and it is not to be supposed that any particular aspect of it must be regarded as a *sine qua non* to the final pattern since all elements will have to be interwoven and brought into symmetrical relation before final action can be accomplished.

It must be obvious that the present argument comes down to this: That by filing a plan which embraces the idea of the funding of tax indebtedness as stated, the Authority has effectually tied the hands of the reorganization court in its duty to consider the trustee's petition, and thus in effect, deprived it of the power to sanction performance by the trustee of the duties imposed upon him by the provision of law quoted above. If the mere filing of such a plan can thus restrict the function of the Court, I have completely misunderstood the law on the subject.

The cases relied upon by the Authority have been examined and do not sustain the foregoing thesis:

Smith v. Hoboken R. R. Warehouse & S. S. Connecting Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123, and Thompson v. Texas Mexican etc. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132, are alike in the nature of the problem presented, namely the forfeiture of a lease in the first case, and the cancellation of a trackage agreement in the second. As to both, the Supreme Court held that neither action could be permitted to stand until the Interstate Commerce Commission had been permitted to present a plan for reorganization unhampered by either action of the reorganization court.

I am unable to see, and have endeavored to explain, why the eventual emergence of a plan having the sanction of the Interstate Commerce Commission will be in the least frustrated by the settlement of this tax liability as proposed.

Ecker v. Western Pacific, 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 deals solely with the function of the Interstate Commerce Commission in the matter of valuations.

Palmer v. Com. of Mass., 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 had to do with proper procedure in connection with abandonment.

Gardner v. State of New Jersey, 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 involved the scope of such a trustee's duty in the matter of litigating state taxes.

It is therefore clear to me at least, that the Court is free to deal with the petition on its merits, and is not constrained to deny the application for the reason that it necessarily runs counter to the ultimate purpose of The Long Island Transit Authority. No reason is perceived why that section of the plan could not be eliminated and the other constructive purposes carried forward, if the plan were to be approved, by a railroad which has been relieved of so considerable an indebtedness as is represented by the figure of $6,744,623; despite misgivings stated by so recognized an authority as Mr. Roosevelt concerning the improved borrowing capacity of the railroad resulting from this settlement, it is difficult to believe that suitable financial arrangements would not be rendered the more available and thereby the desired rehabilitation fostered rather than the reverse. The earlier experience concerning resort to financial commitments to handle the safety program, encourages this view.

The suggestion was made during the hearings that one reason why the petition should be denied is that the lien of the Pennsylvania Railroad as the holder of practically all of the bonds of the debtor would be improved by the cancellation of

the liens of taxes which are senior to the lien of the mortgages securing the bonds. This subject has not been overlooked, but the suggestion is not deemed to be fatal to the petition for the reason that the eventual restoration of its property to the debtor, is not only compatible with but is contemplated by the law under which this proceeding was instituted.

The fact that the debtor is a corporation wholly owned, or almost so, by the Pennsylvania Railroad does not introduce any new principle into the administration of this statute which does not discriminate between corporations based upon the number or characteristics of their stockholders; nor can it be seen that the purpose of such a proceeding is to accomplish a virtual disregard of private property in what is called "the public interest."

While the major opposition has been put forward by the authority, it is also to be remembered that Nassau and Suffolk Counties voice similar views, and the discussion of their arguments need not be prolonged: They of course have the right to refuse to settle their tax claims in accordance with the offer made by the trustee if such is deemed to be in the interest of their own taxpayers; since the Rockaway lines (and therefore the proceeds thereof) did not lie within either county, the lien of their respective taxes enjoys no peculiar status.

Their contentions that it is not expedient or in the interests of the residents of their counties that the funds in question should be devoted to the payment of taxes rather than to rehabilitation has been carefully considered; it is unnecessary to repeat what has heretofore been observed concerning the progress which the trustee has made in the improvement of the rolling stock and other elements of the physical plant of the debtor, which is common knowledge to those who travel on the railroad; nor need extended reference be made to the continuation of all projects heretofore initiated by him to that end. I am satisfied that he is carrying forward a substantial, well-coordinated and practicable program of physical rehabilitation and that he will be able and intends so to do, and

that any departure from such an established purpose will be promptly brought to the attention of the Court by those who have thus far proven themselves to be alert in detecting alleged lapses of administration.

The opposition of the State of New York as finally stated in the record, is in accord with the view advanced by Nassau and Suffolk Counties, and therefore no separate discussion is required in respect thereto.

It should be added that there is good reason to believe that the New York City assessments for the tax year 1953–54 and probably thereafter will be continued on the basis of the valuations as negotiated in the settlement, which is hereby approved.

Motion granted. Settle order.