**MICHIGAN INTERSTATE RAILWAY COMPANY, and Michigan Department of State Highways and Transportation, Plaintiffs,**

v.

**GRAND TRUNK WESTERN RAILROAD COMPANY and United States Railway Association, Defendants.**

Civ. A. No. 78–1.

Special Court, Regional Rail Reorganization Act.

Oct. 18, 1978.

---

Charles W. Chapman, Washington, D. C. (John D. Heffner, Washington, D. C., of counsel), for plaintiff Michigan Interstate Ry. Co.

Fritz R. Kahn, Washington, D. C., for plaintiff Michigan Dept. of State Highways and Transp.

John C. Danielson, Detroit, Mich., for defendant Grand Trunk Western R. Co.

Donald E. Segal, Washington, D. C. (Howard M. Wilchins, Washington, D. C., of counsel), for defendant U. S. Ry. Assn.

Before FRIENDLY, Presiding Judge, and WISDOM and THOMSEN, Judges.

FRIENDLY, Presiding Judge:

This action concerns the rights of plaintiffs, Michigan Department of State Highways and Transportation (MDT) and Michigan Interstate Railway Company (MIRC), with respect to some 10 miles of track between Durand and Owosso, Michigan, formerly owned by the bankrupt Ann Arbor Railroad Company (Ann Arbor). The facts appearing from the pleadings and affidavits are as follows:

The Final System Plan (FSP) as submitted to Congress designated relatively little of the Ann Arbor to ConRail or to profitable railroads. The southern portion of the line, from Toledo, Ohio, to slightly north of Ann Arbor, Michigan, was designated to ConRail, I FSP 282. The 10 mile segment from Durand to Owosso, Mich., was designated to defendant Grand Trunk Western Railroad Company (GTW), I FSP 299, which owned a parallel track between Durand and Owosso only a short distance away. Also designated for transfer to the GTW was a 22 mile segment of the Ann Arbor immediately to the north, from Owosso to Ashley, Mich., over which GTW already held trackage rights, I FSP 299. See also I FSP 359 and II FSP 195–99. By letter dated December 5, 1975, which was reaffirmed on February 9, 1976, the GTW accepted the offer of these lines.

Meanwhile, by letter to the United States Railway Association (USRA) dated August 14, 1975, the State of Michigan sought to obtain the entire line of the Ann Arbor including its car ferry operations across Lake Michigan. At that time, however, USRA lacked authority to modify the FSP as Michigan had requested. Evidently in an effort to do what it could to assist the State, USRA listed in the Official Errata Supplement to the FSP, dated December 1, 1975, in the portion relating to projects recommended under § 206(g) of the Rail Act which would require approval of the Interstate Commerce Commission, the following:

Mt–18–g/Ann Arbor · Mich to Toledo Ohio/Con Rail to grant overhead trackage rights between Ann Arbor Mich (Milepost 47.5) and Toledo Ohio (Milepost 0.0) over the former Ann Arbor Railroad to a rail operator to be selected by the State of Michigan and the GTW to grant as part of the same project overhead trackage rights over all lines acquired pursuant to Project GTW 1300 and 1301.

Projects 1300 and 1301 were the GTW's acquisition of Ann Arbor's lines between Durand and Owosso and Owosso and Ash-

ley. The FSP at I 286 and the December 1, 1976 Official Errata Sheet Supplement at 26 defined "overhead trackage rights" as follows:

> In some of the projects, one railroad is offered "overhead rights" over a rail line operated principally by another railroad, and in others a railroad is offered "unrestricted trackage rights." "Overhead trackage rights" permit the railroad to operate trains over a particular line of railroad but not to serve shippers, sidings, or team tracks located along that line of railroad. "Unrestricted trackage rights" include the right to serve shippers, sidings, and team tracks located along the line of railroad as well as the right to operate through trains over the line.

Section 208(d)(2), added to the Rail Act by the Railroad Revitalization and Regulatory Reform Act of 1976, 90 Stat. 31, provided:

> (2) The Association may, upon petition of any State, modify the final system plan to make further designations with respect to rail properties of railroads in reorganization in the region designated for transfer to the Corporation under such plan, if such designations (A) are likely to result in improved rail service on such rail properties and connecting rail properties, and (B) would not materially impair the profitability of the Corporation. Such designations, including designations of such rail properties to a State, a profitable railroad, or a responsible person, may be made at any time prior to delivery of the final system plan to the special court under section 209(c) of this title. Such further designations shall be treated for all purposes as if they had been included in the final system plan adopted by the Association and reviewed by the Congress, and the final system plan shall for all purposes be deemed to be approved as modified by such designations. Any action of the Association with respect to any such petition shall not be subject to review by any court.

By petition dated February 11, 1976, under the above,[1] Michigan asked USRA to designate to it properties of the Ann Arbor including the properties that had been designated to GTW. At a meeting held on February 19, 1976, USRA's Board of Directors adopted a resolution quoted in the margin.[2] This resolution was included as Appendix O–E to the FSP as certified to this Court pursuant to § 209(c) of the Rail Act. The conveyance appendices to this certification indicated the conveyance to Michigan of the Ann Arbor properties originally designated for ConRail and the conveyance to GTW of the properties designated for it. On April

---

1. The petition also invoked § 208(d)(3)(A). This provides in pertinent part:

    (3)(A) Within 20 days after the date of enactment of the Railroad Revitalization and Regulatory Reform Act of 1976, the Association may, by notice to the Congress and by publication in the Federal Register, modify, supplement, or add to the designations of rail properties in the final system plan if the Association finds such actions are necessary to—

    (i) achieve the efficient implementation of the final system plan, or

    (ii) provide for the offer to profitable railroads of rail properties designated in the final system plan to the Corporation, if such properties are not essential in the operation of other rail properties of the Corporation but are or would be integrally related to the operation of rail properties of (or which are offered pursuant to the final system plan to) such profitable railroad, or

    (iii) provide for the designation of additional rail properties to the Corporation or to a subsidiary thereof to enable the Corporation to serve efficiently a line of railroad designated to the Corporation in the final system plan if such line does not connect with any other line of railroad so designated to the Corporation or if such line would be served more efficiently as a consequence of such designation.

    The only portion which could conceivably be applicable is (i). Clearly this subsection is wholly discretionary, and § 208(d)(3)(C) provides that "any designations made pursuant to this paragraph shall not be subject to review by any court."

2. RESOLVED FURTHER that the Association recommends that the Grand Trunk Western Railroad grant trackage rights to the State of Michigan over that portion of the Ann Arbor Railroad presently designated to Grand Trunk Western Railroad recognizing that such trackage rights would be subject to Interstate Commerce Commission approval.

1, 1976, GTW and MDT signed an agreement wherein GTW granted MDT trackage rights over GTW's Durand-Owosso-Ashley lines;[3] the agreement stated:

It is understood and agreed that the right hereby granted to the COMMISSION or its designate as provided for in paragraph twelfth is the right to run trains drawn with its own power and manned with its own employees between those points herein above mentioned, and intermediate points, but it is not a right to do any local freight and/or passenger business other than the interchange of traffic within the confines of the rights herein granted, and GTW will not perform reciprocal switching.

No attempt has been made to obtain I.C.C. approval of this agreement.

MDT first engaged ConRail to operate the lines that Michigan had taken over from the Ann Arbor; this role was transferred to plaintiff MIRC effective October 1, 1977. Apparently the trains used the GTW line between Durand and Owosso which was in much better condition and was being improved by GTW, and no effort was made by MDT or its operators to serve local industry.

The complaint here alleges that at some time GTW began to build track connections between its own Durand-Owosso line and the shipper sidings on the former Ann Arbor line and that in the spring of 1978 it began to dismantle the Ann Arbor line.[4] The complaint prays that we issue an order:

"1. Granting injunctive or other relief from action taken by USRA in conveying the AA Durand-Owosso line to GTW while only recommending GTW give Michigan open trackage rights over those properties;

2. Challenging the legality of USRA's conveyance and recommendation to GTW;

3. Altering, amending, or modifying its previous order conveying the AA properties to GTW to create and convey to Michigan Department of State Highways and Transportation or Michigan Interstate Railway Co. open trackage rights between Durand and Owosso or, alternatively, to require GTW to grant Michigan Department of State Highways and Transportation or Michigan Interstate Railway Co. trackage rights over the track connections to its own line to permit it to serve the local industries on the former AA line;

4. Setting aside or annulling such conveyance or securing in any way the reconveyance of the rail properties conveyed."

The Ann Arbor Trustee moved for leave to intervene in support of the plaintiffs, and we granted this motion.

On September 20, 1978, we heard argument on two motions by the plaintiffs. One was that we waive as to them the final deadline of July 1, 1977, established by our order of April 29, 1977 (Sp.Ct. Rptr. N-6958), for the filing of any claims that transfers or conveyances were not in the public interest or were unauthorized.[5] The other was for a preliminary injunction restraining GTW from continuing to dismantle and remove the former Ann Arbor track structure on the Durand-Owosso segment. GTW and USRA opposed the granting of these motions. USRA orally moved that we dismiss the complaint for failing to state a claim on which relief can be granted.

---

3. Plaintiffs claim that the trackage rights were granted only over the former GTW line between Durand and Owosso although a contrary position might seem more helpful to them. Particularly since the agreement included the Owosso-Ashley segment which GTW had not previously owned, we see no reason why the agreement should not be read as including the former Ann Arbor line between Durand and Owosso. GTW concedes that the agreement covered its own line.

4. The dismantling has been largely accomplished.

5. We had first established the deadline as December 1, 1976, see *In re Valuation Proceedings*, 425 F.Supp. 266, 269 (Sp.Ct.R.R.R.A.1976) and then extended it to May 1, 1977 (Sp.Ct. Rptr. N-3366). In granting a still further extension to July 1, 1977, we stated, "No further application for extension of this deadline will be granted," Sp.Ct. Rptr. N-6959.

■ Insofar as the complaint is based on an assertion (para. 15) that USRA's action in "merely recommending that GTW grant open trackage to the State of Michigan instead of the normal practice of creating and transferring trackage rights to Michigan as part of the conveyance process was in deliberate disregard of the law", this could well be deemed a claim that the transfer of the Durand-Owosso line to GTW without the "open" trackage rights now sought by plaintiffs was "not in the public interest or . . . unauthorized," *Valuation Proceedings, supra*, 425 F.Supp. at 269, which is now time-barred unless we should waive the July 1, 1977 deadline. However, we were there discussing objections by transferors that too much had been conveyed, not, as here, an objection by a transferee that it had been given too little. We need not decide whether plaintiffs encounter the July 1, 1977 deadline or, if so, whether we should waive it in their favor, since they are confronted by an even more serious bar. In fact their complaint is of inadequacy of USRA's response to Michigan's petition of February 11, 1976, and § 208(d)(2) provides that:

> Any action of the Association with respect to any such petition will not be subject to review by any court.[6]

■ The other allegation in the complaint is that by tearing up the former Ann Arbor tracks between Durand and Owosso, GTW is engaging in an abandonment without the permission of the I.C.C. required by § 1(18) of the Interstate Commerce Act. If that were all, the quick answer would be

6. We add that we would see no ground for faulting USRA much less finding that it "acted in reckless or deliberate disregard of applicable law," § 209(e)(1), if the issue were before us. The designation of the Durand-Owosso segment to GTW was seemingly based on the fact that GTW already had the facilities to serve shippers on this particular segment of the Ann Arbor. Requiring GTW to grant "open" trackage rights to Michigan would have created duplicating service for this relatively small amount of traffic, even if USRA had power to take such action.

7. *Boston & Albany R.R.—Abandonment*, 312 I.C.C. 458, 463 (Div. 4 1961); *Chicago, Milwaukee, St. P. & P. R. Co.—Trackage Rights*, 312

that plaintiffs' remedy is a suit in an appropriate district court under § 1a(9) of the Interstate Commerce Act, rather than by complaint in this Court and we would have no occasion to consider I.C.C. cases cited by GTW[7] that the tearing up of one of two substantially parallel tracks is not an abandonment if service continues to be provided as before. Plaintiffs seek to escape from this by arguing that GTW's dismantling of the Ann Arbor track is destroying their trackage rights.[8] However this may be, these rights do not arise from any requirement of the FSP, the designations thereunder, or any order of this Court; the most that USRA did was to *recommend* in the Official Errata Supplement and in its Board resolution of February 19, 1976, which was certified to us, that GTW grant trackage rights. Any claims arising out of this voluntary agreement are beyond our jurisdiction. Contrast *Consolidated Rail Corporation v. Pittsburgh and Lake Erie Railroad Company*, Civ. No. 78–2, this day decided.

■ In light of the above, we see no need to act on plaintiffs' motions. Rather this is an appropriate case for application of the principle recognized at least as far back as *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856 (1900), and in many later cases, e. g., *Meccano, Ltd. v. John Wanamaker*, 253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822 (1920); *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *Standard Oil Co. of Texas v. Lopeno Gas Co.*, 240 F.2d 504, 510 (5 Cir. 1957); *Hurwitz v.*

I.C.C. 75, 76 (Div. 4 1960); *Missouri Pacific Ry.—Trustee—Construction*, 282 I.C.C. 388, 392 (Div. 4 1952).

8. It is hard to see how this is so if, as seems clear, the April 1, 1976 agreement conferred only "overhead" rights and GTW is providing these. Counsel for GTW asserted that it is providing and will continue to provide such rights over its own superior line between Durand and Owosso. Indeed GTW cannot end the trackage rights without receiving approval of the I.C.C. under § 1(12) of the Interstate Commerce Act. *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 144–50, 66 S.Ct. 937, 90 L.Ed. 1132 (1946).

*Directors Guild of America, Inc.*, 364 F.2d 67, 70 (2 Cir.), *cert. denied*, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966); *Aerojet-General Corp. v. American Arbitration Assn.*, 478 F.2d 248, 253 (9 Cir. 1973); that when it becomes apparent upon an application for a temporary injunction that "the bill be obviously devoid of equity upon its face, and such invalidity be incapable of remedy by amendment," *Mast, Foos, supra*, 177 U.S. at 495, 20 S.Ct. at 712, the complaint should be dismissed.

It is so ordered.