Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 16, 2004   Decided April 6, 2004

No. 03–1212

UNITED TRANSPORTATION UNION-GENERAL COMMITTEE OF
ADJUSTMENT, (G0–386),
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

On Petition for Review of an Order of the
Surface Transportation Board

*Gordon P. MacDougall* argued the cause and filed the briefs for petitioner.

*Alice C. Saylor*, Attorney, Surface Transportation Board, argued the cause for respondent. With her on the brief were *Robert H. Pate III*, Assistant Attorney General, U.S. Department of Justice, *John J. Powers III* and *Robert J. Wiggers*,

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Attorneys, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, and *Craig M. Keats*, Deputy General Counsel.

Before: EDWARDS and HENDERSON, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In the final rule at issue here the Surface Transportation Board adopted a class exemption for temporary trackage rights agreements. See Railroad Consolidation Procedures—Exemption For Temporary Trackage Rights, 68 Fed. Reg. 28,139 (May 23, 2003) ("final rule"), codified at 49 C.F.R. § 1180(d)(8); see also Decision, STB Ex parte No. 282 (Sub–No. 20) (May 9, 2003). The United Transportation Union ("UTU") petitions for review, arguing that the rule doesn't provide the employee protective conditions that the statute requires on discontinuance of the trackage rights. Oddly, the parties seem not to disagree on the statutory necessity of labor protections at the time of cessation; the Board has simply tied itself in linguistic knots on the subject and thus created the appearance—conceivably a correct appearance—of illegality. There being no justification for the Board's verbal disarray, we grant the petition for review and reverse.

\* \* \*

A trackage rights agreement allows a rail carrier to use a railroad line owned or operated by another carrier. Short-term trackage agreements are especially useful to enable carriers "to perform extensive maintenance over portions of their heavily used track." Decision at 2. In the final rule the Board adopted a class exemption for temporary trackage rights agreements, providing a streamlined means by which carriers may obtain Board authorization for agreements that will expire by their terms on a specified date within a year of their start. 49 C.F.R. §§ 1180.2(d)(8), 1180.4(g)(2)(iii); see generally 49 U.S.C. § 10502(a).

UTU's petition for review argues that the final rule lacks statutorily required employee protective conditions. Several background points are undisputed. First, in approving a range of railroad transactions—including a discontinuance of service—the Board must impose conditions protecting employees "who are affected by the transaction." 49 U.S.C. § 11326(a); see also *id.* § 10903(b)(2) (requiring protective conditions on Board approval of a discontinuance of rail transportation). The termination of a trackage rights agreement is among the transactions requiring Board approval, *Thompson v. Texas Mexican Ry. Co.*, 328 U.S. 134, 144–45 (1946), and such discontinuance requires labor protections, Respondent's Br. at 6. Further, the Board may not create exemptions that relieve rail carriers of their obligations to protect the interests of employees. 49 U.S.C. § 10502(g); see also *McGinness v. ICC*, 662 F.2d 853, 859–60 (D.C. Cir. 1981).

UTU claims that the final rule breached these obligations by failing to impose the employee protective conditions associated with discontinuance transactions, commonly known as the *Oregon Short Line* conditions, *Oregon Short Line R.R. Co.—Abandonment—Goshen*, 360 I.C.C. 91 (1979). Instead, the only protections the rule explicitly required were those associated with a carrier's acquisition of trackage rights, the *Norfolk & Western* conditions. See Decision at 5; *Norfolk & Western Ry. Co.—Trackage Rights—Burlington Northern Inc.*, 354 I.C.C. 605 (1978), modified by *Mendocino Coast Ry. Inc—Lease and Operate—California W. R.R.*, 360 I.C.C. 653 (1980), aff'd sub nom. *Railway Labor Executives' Ass'n v. United States*, 675 F.2d 1248 (D.C. Cir. 1982).

The Board doesn't seriously argue that the *Norfolk & Western* conditions apply to the discontinuation of a trackage rights agreement. Indeed, the final rule itself seems to recognize that it is *Oregon Short Line* benefits that are normally imposed on discontinuance transactions. See Decision at 3–4. But, while imposing *only* the *Norfolk & Western* conditions, the final rule also states: "All *transactions* under these rules will be subject to applicable statutory labor protective conditions." 49 C.F.R. § 1180.2(d)(8) (emphasis add-

ed). The Decision includes similar broad language: "[A]ll transactions authorized under these rules will be subject to labor protective conditions as specified in 49 U.S.C. § 11326." Decision at 5.

Tempting as it might be to find that this language satisfied the Board's obligation, the Board has undercut that approach by adopting a narrow definition of "transaction" for purposes of labor protections with regard to trackage rights. In *Norfolk & Western* it said, " 'Transaction' means acquisition by a railroad of trackage rights over . . . any railroad line or lines owned or operated by any other railroad, and terminals incidental thereto." 354 I.C.C. at 610. And in *Mendocino Coast*, 360 I.C.C. 653 (1980), it retained that definition "as relates to leases and trackage rights in lieu of the general definition imposed in *Oregon III* being 'any action taken pursuant to authorization of this Commission on which these provisions have been imposed.' " *Id.* at 663. Given the definition of "transaction" in this context as merely the "acquisition" of trackage rights, the assurance that all "transactions" were subject to required labor protections was confusing at best, doubletalk at worst.

Before us the Board crosses the border into indisputable doubletalk, saying that there was no need to specify discontinuance-type labor protections because, given that discontinuance authority is granted up front, "no discontinuance authority is needed to end limited-term authority [and] the discontinuance provisions of the statute are never implicated." Respondent's Br. at 13–14; but see Decision at 5 ("[T]he authority to exercise trackage rights . . . only until a particular date, implicitly includes the authority to discontinue service on that date."). This is nonsense. Statutory "discontinuance provisions" do not lose their application simply because the Board chooses to exercise its regulatory authority for a specific set of transactions generically and in advance. The Board's exercise of its authority over discontinuance via a generic exemption necessarily triggers the *Oregon Short Line* employee protective conditions as would any other Board-approved discontinuance. See 49 U.S.C. §§ 10903(a)(1)(B), (b)(2).

5

\* \* \*

The final rule is vacated insofar as it withholds *Oregon Short Line* conditions from discontinuances thereunder and is remanded for the Board to specify their application.

*So ordered.*