**CITY OF DES MOINES, Iowa, Plaintiff, East Des Moines Civic Development Association, et al., Intervenor-Plaintiffs,**

**v.**

**CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Defendant,**

**Central Service Company and Arthur H. Neuman & Bros., Inc., Intervenor-Defendants.**

**Civ. A. No. 3-779.**

United States District Court
S. D. Iowa,
Central Division.

Feb. 10, 1958.

Milton W. Strickler, Corp. Counsel, and Anthony T. Renda, City Sol., Fey H. Moody, as Special City Sol., Des Moines, Iowa, for plaintiff City of Des Moines.

Fey H. Moody, Don C. Swanson, Donald L. Beving, Des Moines, Iowa, for intervening plaintiffs.

Frank W. Davis and Ray H. Johnson, Jr., Des Moines, Iowa, for defendant Railway Co.

R. L. Read, A. B. Howland, John Gamble, B. A. Webster, Jr., Des Moines, Iowa, for intervening defendants.

HICKLIN, District Judge.

This is an action brought by the City of Des Moines to restrain the defendant railway company from continuing the use of East Fourth Street, which lies on the east side of the Des Moines River. A petition of intervention was filed by various mercantile establishments also seeking the same aid. The action was removed to this Court on grounds of diversity of citizenship. Since the removal other interventions have been filed on both sides of the case, but further mention or reference to these parties will not be made for the reason that the Court has by this decree disposed of the matter without considering the rights of intervenors.

The defense herein interposed is actually a challenge to the jurisdiction of this Court to proceed further at this time. It quotes a failure to state a claim upon which relief can be granted under paragraph (b) (6) of Rule 12, 28 U.S. C.A., but by way of explanation states that the defendant, Chicago and North Western Railway Company, is a common carrier engaged in interstate transportation and hence is required under the provisions of Chapter 1, Title 49 U.S. Code Annotated, to operate and maintain its railway system unless and until there has first been obtained a certificate of convenience and necessity from the Interstate Commerce Commission, permitting it to abandon its tracks.

It should be noted here that there is no controversy over the fact that the defendant railway company is engaged in interstate commerce and that it is operating under the jurisdiction of the Interstate Commerce Commission, and that the line of railway tracks which occupies East Fourth Street in Des Moines is a portion of the main line of said railway, and is so designated and carried on the records of the Interstate Commerce Commission.

The history of the matters herein covered, both as shown by the evidence in the case and as necessarily admitted in the pleadings by defendant's motion, are as follows: In 1873, the City of Des Moines adopted what is known as Ordinance No. 181, the pertinent portions of which are set out verbatim, and the remainder of which is shown by recital of its meaning.

"Section 1. Be it ordained by the City Council of the City of Des Moines: That the right-of-way be and the same is hereby granted to the Des Moines & Minnesota Railroad Company on Fourth Street, on the east side of the Des Moines river, from the southerly terminus of said Fourth street northwardly to where it intersects with Locust Street; thence northwardly along that portion of Fourth street formerly known as Cedar street, as far north as lot number eighteen, of Griffith's outlots, on said street, and from thence upon so much only of the west side of said street as to make a continuous and straight line and connect with the center of said street where said street intersects the Stansberry levee, to the point where said street connects or strikes the old Boonsboro or Fort Dodge road; thence northwardly along said road to the north line of the city of Des Moines and across such streets and alleys as said Fourth on Fourth, formerly known as Cedar Street, intersects, and the said railroad company is permitted to lay down a single or double track and switches, turn-outs and side-tracks on and along said street; * * *."

This section further authorized the railway company to operate trains at such rates of speed as might be fixed by the Council, and further fixed the grade of the street so as to conform with river levees, and provided that certain streets should be crossed without changing the grade of intersecting streets, and provided that the grade of the roadbed should be raised or lowered at the expense of the railroad company so as to conform to any grade that may hereafter be established.

"Sec. 2. The center of the right-of-way so granted to said railroad

company shall be in the center of said Fourth Street, and no track or side-track, nor any part thereof, except as herein provided, shall be laid nearer than twelve feet of the space set apart by ordinance for sidewalks on said Fourth street, south of Locust street, nor more than eight feet of the space set apart by ordinance for sidewalks of said Fourth street, between Locust street and Grand avenue, nor nearer than six feet of the space set apart by ordinance for sidewalks north of Grand avenue; provided, that in consequence of an offset in said Fourth street, at Locust street, said tracks may vary from the provisions of this section at Locust street, but not nearer than is indispensably necessary in consequence of said offset. But said railroad company is hereby authorized to lay down and operate such side-tracks, and in such place or places as may be necessary to conveniently approach any depot, shop, cattle-pen, round-house, water-tank or turn-table that they may erect adjacent to the street on which said right-of-way is granted; provided, that said railroad company shall not use more than half the width of said street adjacent to said round-house, cattle-pen, water-tank or turn-table; provided, however, that the track or tracks of said road shall cross all the streets that Fourth street intersects, save and except Locust street, at right angles."

Section 3 provided that the railroad should not be located or laid down until every claim for damages or injuries to property was paid.

Section 4 provided: "Said railroad company shall, in constructing its road, build and shall keep in repair sufficient wagon-ways and water-ways, or culverts, and of sufficient number and size to afford at all times the free passage of water and public travel without obstruction, and increase the number and size of water-ways, or culverts, on or under the grade of said railroad or roadbed within the limits of the city of Des Moines, *wherever and whenever a majority of the members of the City Council of Des Moines shall order or direct.*" (Emphasis supplied.)

Section 5 provided that the railroad company should build and keep in good repair plank walks between the rails if a single track and also between the rails and tracks of a double track.

Section 6 was: "Said railroad company shall build and operate its railroad from the Chicago, Rock Island & Pacific Railroad, in the city of Des Moines, and connect its road with the Northwestern Railroad within two years from the passage of this ordinance, and said company shall not use or occupy at any place on Fourth street, or any other street or alley in the city of Des Moines more than twenty-five feet in width of said street or streets and alleys."

Section 7 provided that the railroad company would agree to comply with all ordinances which might now or hereafter be passed by the City Council with reference to speed or stopping of trains, or the operating of the road.

Section 8 provided that the right-of-way should not be exclusive, but that the City reserve to itself the right to grant to any other railroad company the right to pass over, across or along any street or alley "in such manner as not to prevent the use of the tracks of the said Des Moines & Minnesota Railroad." Said clause also provided that this grant should not interfere with the vested rights of any person or persons, acting under the authority of the City of Des Moines.

Section 9 provided that a failure on the part of the railroad company to comply with any of the provisions or obligations of this ordinance, shall work an immediate and absolute forfeiture of all rights and privileges granted.

On September 15, 1947, a notice of forfeiture was directed to be served up-

on the railway company, a hearing was had, and on November 3, 1947, a resolution was passed by the City Council of Des Moines which concluded in this language:

"Be it further resolved that all rights and privileges in any manner acquired by the said Railway Company in East Fourth Street be and they are hereby declared forfeited, cancelled and annulled from and after the date of the passage hereof."

The petition further alleges that numerous discussions have been held between the parties, all to no avail, and that the defendant has failed and refused to vacate East Fourth Street. It is further plead that the railroad tracks are an obstruction of East Fourth Street and constitute a nuisance. It is finally plead that the plaintiff has no plain, speedy or adequate remedy at law, which final statement we conclude to be essential to the prayer for the issuance of an injunction.

It is also necessary to relate certain facts which are important. A railway was constructed on East Fourth Street shortly after the granting of the right-of-way. East Fourth Street runs generally in a north and south direction. At East Fourth and Vine Streets there is an intersection with the Chicago, Rock Island & Pacific Railroad. In 1884, the defendant acquired the Des Moines & Minnesota Railroad, and ever since said time it has maintained a connection between the Chicago, R. I. & P. Railroad and the North Western Railway. Several blocks east from this intersection there is located what is known as the Iowa Transfer Yard, where the interchange of transportation between the various railway systems entering Des Moines is conducted. The North Western Railway conducts its part of such transactions by utilizing the Rock Island lines between East Fourth Street and the transfer yard. Actually, East Fourth Street extends a distance from north to south of approximately eight blocks. At one time it had rather elaborate switch tracks and a depot, which

has now been removed. The petition, as well as the record, shows that there have been extensive negotiations between the City and the railway to relocate some of the railway activity, and a new yard has been laid out in northeast Des Moines, and the North Western has been conducting negotiations with another railroad, to wit, the Fort Dodge, Des Moines & Southern Railway, by which it would hope to gain access to the Iowa Transfer Yard through its own yards and thus become enabled to abandon the necessity of utilizing at least a portion of East Fourth Street. Testimony shows that the Fort Dodge Railway has been raising the price and no agreement has been reached. A plat of East Des Moines, with tracings of the route of the Chicago and North Western Railway Company, as well as its planned new access over the Fort Dodge, Des Moines & Southern, is attached to the pleadings and was shown to the Court in this hearing.

The increase in the population of Des Moines and the great magnification in street traffic have made traffic control a major problem. The occupancy of East Fourth Street by railway tracks has without question resulted in interference with automobile traffic.

The City takes the position that the right of the railway to occupy East Fourth Street with its tracks was terminated in 1947, and that therefore such occupancy now creates a nuisance under the provisions of Chapter 657 of the Code of Iowa, and that Section 389.12 of said Code vests statutory control of the streets in the city councils and requires them to keep the streets open and free of nuisances.

The plaintiffs assert that there is a distinction in the consideration upon which their action is based. They say that if they were to seek discontinuance of the railroad traffic on East Fourth Street for the purpose of improving railroad transportation in Des Moines or for the purpose of improving the efficiency of the North Western Railway, then they would be stepping into an area which had been reserved by Congress for

the administration of the Interstate Commerce Commission. They say, however, that the prayer of their petition is devoted solely in the interest of discharging their duties and responsibilities under the laws of Iowa, and that they are indulging in the exercise of a police power, and do not seek to prevent the North Western Railway from operating its lines and from finding other connections to the transfer yard and with other railway lines in the City. They suggest that if the Court will but terminate the operation of railway traffic on East Fourth Street in Des Moines, then the North Western Railway will of necessity proceed under its own motion to seek the approval of the Interstate Commerce Commission for the relocation of its tracks.

It is the view of this Court, however, that if the action or authority of an administrative body should appear to be available, which can solve the innumerable problems which would be created by terminating traffic on East Fourth Street, then the action of such agency ought to be invoked, and in fact it would be made to appear that plaintiff has not exhausted all of its legal remedies. Even if this Court could grant the relief prayed, it does not seem that such power could be exercised without the creation of other ills which would require administrative action by the Interstate Commerce Commission.

The authority for holding that the Interstate Commerce Commission is available to the City of Des Moines for any application which it wishes to make, is contained in the decision of the United States Supreme Court in the Tex-Mex case hereinafter referred to, Thompson v. Texas Mexican R. Co., 328 U.S. 134 at page 145, 66 S.Ct. 937 at page 944, 90 L.Ed. 1132, where it says:

"An application by a city and county for abandonment of a part of the Colorado & Southern line was indeed entertained. Colorado & Southern R. Co. Abandonment, 166 I.C.C. 470."

Plaintiff has supplied this Court with a voluminous brief, which deals principally with the right of Federal courts to intervene in cases where corrective improvements have been sought to be made in railroads, such as elevations of tracks, separation of grades, etc. These the Court does not consider as being in point.

Plaintiff has cited, and with some justification, the case of Town of Conway v. Atlantic Coast Line R. Co., D.C., which appears in 20 F.2d at page 250, et seq. The facts in the cited case are very similar to the one at bar, but are easily distinguishable. In that case, it appears that the Town of Conway was a vilage with a town council, and that in 1887 the Board of County Commissioners made a decree which purported to grant to the Wilmington, Chadbourn & Conway Railroad Company (later the Atlantic Coast Line), a permission to build its tracks on and along Main Street of the Village of Conway upon condition that: (1) the track be built so as not to interfere with or obstruct its use of the highway; (2) that all crossings of the streets be made so as not to interfere with its use as a highway.

Later, the village became a town, and on the 5th day of November, 1912, the town council of Conway adopted two ordinances, one of which revoked the permission of the railroad company to operate any train on the city street, and the second of which ordinances created a penalty for allowing any train or railway car to remain standing for longer than one minute on Main Street, or for switching cars back and forth. It will be noted that both of these ordinances were passed some eight years before the enactment of the Transportation Act. Neither of said ordinances were complied with and the town of Conway sought an injunction in the Federal court. The case was decided in 1926.

As in the case at bar, the railroad company set up the contention that under the Transportation Act of 1920 it was not lawful for it to abandon any

**228**

part of its right-of-way without a certificate of approval from the Interstate Commerce Commission.

The Court said (20 F.2d at page 260):

"The theory of the defendant is that the Transportation Act, as construed by the cases referred to, constituted a new departure, and sought affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country, and that the power to order the abandonment of any track is now lodged solely in the Interstate Commerce Commission, and no change can be made without its consent. *But I do not construe the act to apply to a case like the one at bar. The defendant does not seek to abandon a portion of its track. Nor does the town seek to compel it to abandon a portion where it has a legal right to remain. The act of Congress was intended to apply to those cases where the railroad company seeks to abandon a portion of its line of railroad, and possibly where it is sought to compel it to make such abandonment; but it was not intended to apply to those cases where the railroad is a trespasser, or where the railroad's occupancy is only by permission, and such permission has been revoked.*

"When the town in this case revoked the permission theretofore given to occupy the street, the railroad company then had no further right in the same. * * * *My view is that the act was not intended to apply to a case where the defendant's rights in the premises had ceased, and that no certificate from the Interstate Commerce Commission is necessary, and that this court has full jurisdiction to determine the rights of the parties, and to require the removal of the track if the railroad has no further legal right to keep it there.*

"*My conclusion, therefore, is that the decree of the board of county commissioners is not to be deemed a grant of a franchise in perpetuity, and that, if so construed, it would be ultra vires, null, and void, but is to be deemed a mere temporary permission, which could be withdrawn, either by the board or their successor, the town of Conway, and that the ordinances above set forth of the town of Conway are valid in so far as they revoke the permission given by the decree of the board, and that the plaintiff is entitled to a mandatory injunction requiring the defendant to remove its track from Main street in the town of Conway within a reasonable time, and cease operating its trains along that street.*"

In holding that the Conway case is not controlling, this Court points out the following outstanding differences:

*1.* The council of the town of Conway was held to have terminated the permissive right of the railroad in 1912. Hence, after that date, and prior to the enactment of the Transportation Act of 1920, the *railroad company actually had no right on the street.*

*2.* In the case at bar, however, whatever rights were possessed by the North Western Railway were in actual existence until 1947, and so far as traffic on East Fourth Street was concerned, this was a part of its interstate system and was under the control, for purposes of abandonment, of the Interstate Commerce Commission.

*3.* In the Conway case the Court held that it believed the ancient existing rights of the railroad were permissive only and were terminated in 1912. This Court cannot escape the conclusion that the early contract between the City Council of Des Moines and the North Western Railway and its assignors, not only was a franchise which continued long after the enactment of the Transportation Act of 1920, but that Section 6 of said franchise was actually an agreement between the North Western Railway and the City of Des Moines whereby East Fourth Street was made a

part of the interstate commerce system. This agreement was in existence for many years after 1920. Had the City of Des Moines rescinded Ordinance 181 prior to the enactment of the Transportation Act, the Conway case would apply. It was necessarily taken over and into the jurisdiction of the Interstate Commerce Commission when it was created by Congress in 1920. It follows therefore that the consent of this Commission to vacate or abandon said track on the part of either the railway company or the City of Des Moines is a prerequisite to its being done by either.

We believe that the principles established in the case of Thompson v. Texas Mexican R. Co., 328 U.S. 134 at page 144, 66 S.Ct. 937, at page 944, 90 L.Ed. 1132 must control:

"By § 1(18) of the Interstate Commerce Act it is provided that 'no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment.' Carriers being reorganized under § 77 of the Bankruptcy Act are not exempt from that provision. § 77 sub. (*o*), 11 U.S.C. § 205 sub. (*o*); Warren v. Palmer, 310 U.S. 132, 137, 138, 60 S.Ct. 865, be the powers of the Commission under the Interstate Commerce Act, rather than § 77, over the terms of the trackage agreement, Abandonment of Chicago, R. I. & P. R. Co., 131 I.C.C. 421; Kansas City Southern R. Co. v. Kansas City Terminal R. Co., 211 I.C.C. 291, it is clear that the Commission has jurisdiction over the operations. Sec. 1(18) embraces operations under trackage contracts, *as well as other types of operations*. See Chicago & Alton R. Co. v. Toledo, P. & W. R. Co., 146 I.C.C. 171, 179–181. And the fact that the trackage contract was entered into in 1904 prior to the pas-sage of the Act is immaterial; *the provisions of the Act, including § 1 (18), are applicable to contracts made before as well as after its enactment.* See Louisville & Nashville R. Co. v. Mottley, 219 U.S. 467, 482, 31 S.Ct. 265, 270, 55 L.Ed. 297. *Though the contract were terminated pursuant to its terms, a certificate would still be required under § 1 (18).* Brownsville or its trustee could, of course, make the application for abandonment of operations. But the fact that they might be content with the existing arrangement and fail or refuse to move does not mean that Tex-Mex would be burdened with a trackage arrangement in perpetuity. Tex-Mex might invoke the Commission's jurisdiction under § 1(18) and make application for abandonment of operations by Brownsville or its trustee. There is no requirement in § 1(18) that the application be made by the carrier whose operations are sought to be abandoned. *It has been recognized that persons other than carriers 'who have a proper interest in the subject-matter' may take the initiative.* See Atchison, T. & S. F. R. Co. v. Railroad Commission, 283 U.S. 380, 393, 394, 51 S.Ct. 553, 556, 557, 75 L.Ed. 1128. *An application by a city and county for abandonment of a part of the Colorado & Southern Line was indeed entertained.* Colorado & Southern R. Co. Abandonment, 166 I.C.C. 470. Tex-Mex has even a more immediate interest in the operations over this line. Its property is involved; and the amount being paid for the use of its property is deemed by it insufficient. The Commission is as much concerned with its financial condition as it is with that of Brownsville. Tex-Mex therefore has the standing necessary to invoke § 1(18)." (Emphasis supplied.)

After a discussion of another point in the case not involved here, the Court

went on to conclude, 328 U.S. at page 151, 66 S.Ct. at page 947:

"*Thus, however the case may be viewed, the court below should have stayed its hand and remitted the parties to the Commission for a determination of the administrative phases of the questions involved. Until that determination is had, it cannot be known with certainty what issues for judicial decision will emerge. Until that time, judicial action is premature. The judgment will be reversed and the cause remanded so that the case may be held pending the conclusion of appropriate administrative proceedings.*" (Emphasis supplied.)

While it is true that the Tex-Mex case above cited applied to a controversy between railroads, yet the contractual rights are not altered because one of the parties was a city.

In conclusion, it is therefore our holding that the action of plaintiff is, to say the least, premature. The Court could follow the ruling in the Tex-Mex case and direct that the cause be abated pending the conclusion of appropriate administrative proceedings without ruling that the plaintiff might not at some future date seek other and further appropriate relief. Nevertheless, we must assume that a complete adjustment can be worked out by these administrative processes. If some injunctive action remains to be sought after, this can be applied for specifically.

It is only necessary for us to determine at this time that the provisions of Title 49 U.S.C.A. Section 1(18) ought to be complied with before the traffic on East Fourth Street should be abandoned, and that this Court is therefore without jurisdiction in this matter at the present time. It is our view that if proper application is made to the I.C.C., that abandonment of the tracks on East Fourth Street may be authorized upon the petition of either the City or the railway, and further that the I.C.C. will approve such plans as may be submitted for the more expedient routing of rail-

way traffic and connections with other lines, including a solution of negotiations for use of the Fort Dodge, Des Moines & Southern Railway by the North Western, and these are collateral matters over which this Court would have absolutely no jurisdiction.

It is therefore ordered that plaintiffs' petition ought to be, and is hereby, dismissed, with the further right to reinstate its cause in the event that administrative remedies have been applied.