**CITY OF DES MOINES, IOWA, Capital City State Bank, Des Moines, Iowa, and Iowa State Bank, Des Moines, Iowa, Appellants,**

v.

**CHICAGO & NORTH WESTERN RAILWAY COMPANY, Appellee.**

No. 15981.

United States Court of Appeals
Eighth Circuit.

March 5, 1959.

Donald L. Beving, Des Moines, Iowa (Milton W. Strickler and Fey H. Moody, Des Moines, Iowa, on the brief), for appellants.

Frank W. Davis, Des Moines, Iowa (Ray H. Johnson, Jr., and Davis, Huebner, Johnson, Herring & Burt, Des Moines, Iowa, on the brief), for appellee.

Before SANBORN, JOHNSEN and VAN OOSTERHOUT, Circuit Judges.

JOHNSEN, Circuit Judge.

In a diversity suit, removed from state court, the City of Des Moines, Iowa, sought a writ of injunction against the Chicago and North Western Railway Company, to prevent the Railway from further using East Fourth Street in the City as part of its right of way, and to compel it to remove its tracks and roadbed therefrom. A number of interveners joined in the City's request for relief.

The Railway is an interstate carrier, subject to the provisions of the Interstate Commerce Act, Title 49 U.S.C.A. Chapter 1. One set of the tracks involved was part of the Railway's main line between Des Moines and Ames, Iowa. Others consisted of tracks used in effecting freight interchange, through the Iowa Transfer Yard, with the six other interstate railroads in the Des Moines area. This constituted the only means which the Railway existingly had of accomplishing such interchanges. All of the facilities which the City was attempting to have removed thus represented elements used in carrying on the Railway's interstate operations.

The Railway filed a motion to dismiss the suit, on the grounds that what the City was seeking to do was (in the Railway's language) "to compel an abandonment by the defendant of a portion of its line of railroad", and that the City could not demand such a result unless and until it obtained from the Interstate Commerce Commission permission for such an abandonment to be made.

The motion relied on 49 U.S.C.A. § 1, par. (18), which so far as here pertinent, provides: "No carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment".

The trial court granted the motion and made dismissal, with leave to the City to have the suit reinstated in the event that the Interstate Commerce Commission should give its permission to such vacating or abandonment of the Railway's existing line as would be involved, and if a reinstatement could be capable thereafter of serving any legal purpose. The court's opinion relating to its ruling on the dismissal is reported in D.C., 159 F.Supp. 223.

The complaint had predicated the City's right to have the Railway injunctively ousted from the street on the basis that the Railway had violated the conditions of the grant by which it originally had been permitted to use the street for right of way purposes, and that these violations had given rise to a forfeiture in favor of the City, which the City Council had duly declared.

The Railway's right to occupy the street had its source in an ordinance, enacted by the City Council in 1873, which "granted" to the Railway's predecessor a right of way in the center of Fourth Street, extending a distance of approximately eight city blocks, and which "permitted (it) to lay down a single or double track and switches, turnouts and side tracks on and along said street". Conditions were imposed in respect to the construction and maintenance of the right of way, and the grantee further was required "to run such locomotives and cars, or trains of cars, over and upon the same, and at such

reasonable rates of speed as may be fixed upon, from time to time, by a majority of the members of (the) City Council". There was a provision for forfeiture, that "a failure on the part of said railroad company, or the future owners of said road, to comply with any of the provisions or obligations of this ordinance, shall work an immediate and absolute forfeiture of all rights and privileges granted by this ordinance".

No period was specified in the ordinance as to the length or duration of the grant otherwise. In relation to the nature and permanence of the right intended to be granted, however, the ordinance provided that the grantee "shall not locate nor lay down its railroad tracks until each and every claim for damages or injury to property, in consequence of the location of said road, and of grading now done, or that may be done on the line of said railroad and within the limits of the city of Des Moines, has been paid, or amply secured by said (grantee) or the future owners of said road". Also, there was a consummating provision that the grantee should have twenty days in which to file a written acceptance of the grant and its terms, and that upon such an acceptance being made there would exist "a contract between the city of Des Moines and said (grantee)".

In 1947, the City Council served notice upon the Railway, to appear before the Council and show cause why such rights and privileges as had been granted it by the 1873 ordinance should not be revoked and forfeited, for alleged violations of the terms of the grant, as specified in the notice. While the notice made some charges of direct violations of the ordinance, such as that the Railway's right of way had not been located in the center of Fourth Street and that the Railway had not kept the space between its rails in proper planked condition as required by the ordinance, it is obvious that the real grievance in the situation lay in the general charge of the notice that the Railway had been guilty of a "continuous, unreasonable and unlawful blockading" of street traffic on the five main east-west thoroughfares which intersected Fourth Street. The notice went on to expand this grievance by declaring that the growth of the "entire business district" was being retarded by this traffic obstruction; that the comfort and convenience of pedestrians and drivers of vehicles were being materially interfered with; that, although the matter had been called to the Railway's attention, the situation still was being continued, "midst the loud laughter from (Railway) officials"; and that "the protests from both pedestrians and drivers of vehicles are increasing day by day".

Following a hearing, at which the Railway appeared, the Council adopted a resolution, declaring that the Railway had failed to comply with the provisions and obligations of the granting ordinance, and providing that all rights and privileges of the Railway in East Fourth Street were "forfeited, cancelled and annulled", effective immediately. No legal steps were taken, however, to prevent the Railway from continuing to use the street, until the institution of this suit, ten years later.

The position of the City, as set out in the complaint, was that a valid forfeiture had been effected by the 1947 action of the City Council, and that the Railway's occupancy and use of the street had therefore since that time had the status of a continuing trespass and nuisance which the City was entitled to have enjoined.

The granting ordinance, however, had contained no language of reservation of power or right in the City to adjudicate and declare a forfeiture, so as to conclude the question in that manner against the Railway. As previously indicated, the provision for forfeiture was that "a failure on the part of said railway company, or the future owners of said road, to comply with any of the provisions or obligations of this ordinance, shall work an immediate and absolute forfeiture of all rights and privileges granted by this ordinance".

The most that could be claimed on this expression would be that the provision

for forfeiture was self-operative upon a violation of the ordinance having occurred—a question which is not before us and which we therefore do not consider.

■ If the provision for forfeiture was self-operating, the City Council might perhaps engage in a declaration of forfeiture as a means of evidencing its intent not to waive the effect of such violation as it regarded as having occurred. But this could not cut off the Railway's right, existing on the lack of a reservation in the City Council to resolve the question, to have a judicial determination made of whether violation had in fact existed and, if so, whether the violation was such in character as would set in operation the forfeiture provision of the ordinance. See 23 Am. Jur., Franchises, § 38.

■■ Regardless, however, of whether a valid forfeiture would have existed under the ordinance, a court could still not decree an ouster of the Railway from the street, so long as this might mean an abandonment or discontinuance of a portion of the Railway's line or operation in the interstate field, until the Interstate Commerce Commission gave its permission to such abandonment or discontinuance being made. Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132; Smith v. Hoboken R. R. Warehouse & S. S. Connect. Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123.

The City argues that 49 U.S.C.A. § 1, par. (18), supra, and the Thompson and Smith decisions cited, should not be regarded as having any application to such portions of a railroad's line as are located in public streets or highways—at least not where the railroad's occupancy has the status, as claimed here, of a trespass and a nuisance. We do not believe, however, that such an exception or exemption can impliedly be read into the language and purpose of § 1, par. (18), or into the expression or doctrine of Thompson and Smith opinions (although these were non-street situations), when the nature of the Interstate Commerce Act as a preemptive and comprehensive "scheme of regulation" is considered.

And to the extent that Town of Conway v. Atlantic Coast Line R. Co., D.C.E.D. S.C., 1926, 20 F.2d 250, on which the City relies, gives recognition to such an exception or exemption in Interstate Commerce Commission domain, we must refuse to follow it.

There is here involved an occupancy and use of a street by the Railway, under what the 1873 ordinance termed a "grant" and a "contract". The dedication that had thus been made and which was still existing at the time of the enactment of the Transportation Act of 1920—by which par. (18) was added to the provisions of § 1 of the Interstate Commerce Act, 41 Stat. 477–478—was in its transportation aspect and significance made subservient to the power of the Interstate Commerce Commission to deal with all questions of abandonment thereafter arising, in respect to a railroad's line or its operation or any portion thereof, on the basis of public convenience and necessity.

The Supreme Court said in the Thompson case that "the fact that the * * * contract was entered into * * * prior to the passage of the Act is immaterial; the provisions of the Act, including § 1 (18), are applicable to contracts made before as well as after its enactment". 328 U.S. at page 144, 66 S.Ct. at page 944. The Court further stated that, regardless of whether "the * * * contract expired by its terms or was terminated by operation of an escape clause", the termination could not affect the Commission's power to deal with the matter of abandonment involved, nor the need to have this done, as a question of public convenience and necessity, and that, "Until abandonment is authorized, operations must continue". 328 U.S. at page 147, 66 S.Ct. at page 945.

While, as has been noted, the Thompson case did not involve tracks and operations in a public street but on private property, it seems obvious that, if disruptions in carrier systems may not occur unless public convenience and necessity will permit, it is as much necessary that authorization should be ob-

tained from the Interstate Commerce Commission for abandonments of lines or operations in public streets as for abandonments of other portions of a railroad's lines or operations. On the regulatory purpose of the statute, and on the lack of any qualification in the language of the abandonment provision, we are therefore unable to see any basis or warrant to delimit the Commission's authority by such an exception or exemption as the City urges.

The further argument is made, however, that even though the statute be viewed as we have done, the situation here still would not fall within the Commission's domain as to abandonment, because what actually is involved, it is said, is simply a relocation by the Railway of rails and right of way and not an abandonment of line or operation.

There have been instances in which the Commission apparently has thought it unnecessary for it to deal with some particular change as a question of abandonment. These have been situations of unsubstantial change in track location, having, as the Commission viewed it, no possible effect upon service to shippers, and no transportational significance otherwise as related to the railroad itself, or to other carriers, or to the public generally. See Philadelphia, Newton and New York Railroad Company, 67 I.C.C. 252; Missouri Pacific Railroad Company Trustee Construction, etc., 282 I.C.C. 388.

The Commission may be able to say on the face of some situation that no element of public convenience and necessity is involved in a particular track change or substitution, calling upon it to exercise its powers as a question of abandonment. This, we think, would be because the question of when public convenience and necessity is involved or whether it is affected is in the first instance exclusively within the Commission's domain. Hence, as to any transportational element, such as here, of which the Commission has been given jurisdiction on the basis of public convenience and necessity, a court is not at liberty to engage in plenary adjudication, on the

theory that such convenience and necessity will not be affected in the particular situation.

The fact that the Commission may have viewed some particular situation of track relocation as not requiring it to make a finding in relation to public convenience and necessity as a question of abandonment does not entitle a court to engage in the function of surveying other degrees of change or substitution on general principle, so as in effect to set initial legal stakes for public convenience and necessity. With the term "abandonment" being related in the statute to the question of public convenience and necessity, the courts must recognize the significance of this intertwining and allow the meaning which is thus mixed into the term to have its full play.

In short, any question, necessary to a judicial disposition, relating to change in railroad line or operation, on which there is room for colorable doubt or controversy as to whether public convenience and necessity is involved or is affected, and in which it therefore may be possible for an abandonment to be present in a transportational sense, even though not by general legal criterion, must ordinarily be referred to the Commission for answer; and this is true regardless of the fact that the Commission may on presentation thereof see fit to conclude that the situation does not require it to make a finding in relation to public convenience and necessity as a question of abandonment.

As a matter of fact, however, the situation here goes beyond the point of simply presenting colorable doubt or controversy in respect to the existence of Commission questions. There is no basis abstractly or as a matter of undisputed facts for any evaluation to be engaged in of what the effect of a decree of ouster against the Railway might be. If it be presumed that the Railway would attempt to find some way of preserving its lines and operations, it is clear that such form and extent of relocation and other changes would be necessitated as could not be branded as purely nominal

even by naked legal criterion, apart from the possibility of these substantialities having relation to or effect upon public convenience and necessity.

The substantialities of physical changes involved are also here mixed in with scopes of acquisition, expenditure, or arrangement with other carriers, which themselves could conceivably create differences affecting the public convenience and necessity now being served. In fact, shippers who were permitted to intervene in the suit have insisted that what the City is seeking to accomplish inescapably involves prejudice to their existing service.

On all these considerations, it seems clear to us that the situation is one which a court does not have an initial right to examine and appraise, but which must be referred to the Commission for answer, before any ouster could at all be decreed, on whether such changes are capable of being made as not to affect the public convenience and necessity being served and so perhaps not to require authorization from the Commission of abandonment, or whether, if public convenience and necessity will be affected, this convenience and necessity nevertheless will permit of such differences in service or abandonments as may be entailed.

Legally, it might impress that the court ought to have made preliminary disposition of the question of forfeiture, in order to see whether there would be any occasion for it to reach the consideration of ouster and any need to impose upon the Commission as to the administrative questions affecting it. If no forfeiture existed, the City would be left without the basis on which the complaint had predicated its right to seek relief.

On the other hand, however, if the situation were one in which a forfeiture could legally be declared to exist, it is clear from the Thompson and Smith cases, supra, that it would be improper for the court to engage in such a declaration prior to the Commission's consideration and expression on the question of public convenience and necessity. 328 U.S. at page 144, 66 S.Ct. at page 944;

328 U.S. at page 133, 66 S.Ct. at page 953.

Quoting from the Thompson opinion—"A court which enforced the termination clause of the agreement pursuant to its terms would be narrowing the choice of the Commission and perhaps embarrassing it in the performance of the functions with which it has been entrusted", and "For these * * * reasons * * * we think the court erred in holding that the * * * agreement had been or should be terminated". Ibid.

Thus, the trial court was entitled to require that the administrative question inherent in the situation be precedingly referred to the Commission before adjudication of the question of forfeiture.

We are of the opinion, however, that the interests of the parties would be more effectively served by not dismissing the suit, as the trial court did, but allowing the case to pend while resort was being had to the Commission for consideration of the administrative questions. Such a pendency of suit was directed by the Supreme Court in the Thompson and Smith cases. And, as we pointed out in United States v. Kansas City Southern Railway Co., 8 Cir., 217 F.2d 763, 769, the trend in the District Courts has been "to hold judicial actions in abeyance, rather than to dismiss them, in which questions requiring resolution by administrative authority are presented, except where administrative jurisdiction and available remedy of such a nature exist and are exercisable at the time of the court's consideration, as to appear to be capable of ending the controversy, or except where the court otherwise can reasonably believe that no substantial legal or equitable purpose is likely to be served in the particular situation by a staying of the court's dismissal hand".

Here, although the Railway sought dismissal of the suit, it still asserted that the question of forfeiture would remain a matter ultimately "to be litigated on the merits", whether the Commission found that the changes inherent in an ouster of the Railway from the street would or would not affect public con-

venience and necessity, and that, even though public convenience and necessity could thus be affected, such convenience and necessity nevertheless would permit of the changes or abandonment being authorized by the Commission. A determination by the Commission that public convenience and necessity would permit of an abandonment would not wipe out the legal rights which might exist. Pendency of the action would, in the event of such a Commission determination, leave the City in a position to obtain a prompt decision on the question of the Railway's asserted legal rights. Moreover, in bringing this protracted controversy to a head, presentation and consideration of an administrative question as an incident of a pending judicial proceeding would perhaps be likely to be given a priority or impetus over what it might have as an independent or abstract matter.

In what we have said as to the question of possible legal rights, it is to be borne in mind that this question is here involved only in relation to the matter of whether a forfeiture exists. The power of the City or of other Iowa authority, in the public interest, to compel the Railway otherwise to change its form or mode of use of such legal rights as it may have—recognized in such cases as Erie R. Co. v. Board of Public Utility Com'rs, 254 U.S. 394, 41 S.Ct. 169, 65 L.Ed. 322—is in no way involved in the present case. Nor is the question of the power of the City under the granting ordinance, or as a matter of general police power, to make regulation of the Railway's operations at the affected street intersections here involved.

The order of dismissal made is vacated, and the case is remanded to the trial court, with directions to deny the Railway's motion for dismissal; to require the Railway to file answer and frame the legal issues in the situation; to allow the City to file reply; to stay further proceedings in the case until a determination or other disposition shall have been obtained from the Interstate Commerce Commission on the administrative

questions and considerations involved; to enter any other incidental or facilitating orders as the court may deem necessary or appropriate; and to reserve the power to terminate the pendency of the suit or to appropriately make other disposition thereof at any time and in any manner, if subsequently seeming to be desirable on the entire situation.

Order of dismissal vacated and cause remanded with directions.