**CHICAGO & NORTH WESTERN RAIL-WAY COMPANY, a corporation, Plaintiff-Appellee,**

v.

**CHICAGO, MILWAUKEE, ST. PAUL AND PACIFIC RAILROAD COMPANY, a corporation, Defendant-Appellant.**

**No. 73-1349.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1974.

Decided Sept. 6, 1974.

James P. Reedy, Anthony W. Summers, Chicago, Ill., for defendant-appellant.

Edward Warden, James P. Daley, Chicago, Ill., for plaintiff-appellee.

Before CASTLE, Senior Circuit Judge, and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

In 1932, the Chicago, Milwaukee, St. Paul and Pacific Railway (the Milwaukee) and the Chicago & North Western Railway (North Western) [1] entered into an agreement granting the Milwaukee the right to use jointly with North Western a certain section of main line track owned by North Western. In 1971, North Western attempted to ter-

---

1. The parties, Wisconsin corporations, are common carriers by railroad engaged in interstate commerce and subject to the Inter- state Commerce Act. See 49 U.S.C. § 1 et seq.

minate the agreement. When the Milwaukee rejected the notice of termination, North Western instituted the present action seeking, *inter alia,* that the Milwaukee be enjoined from using the line and that plaintiff have judgment for $1,250 per day for each day of defendant's use of the line subsequent to the termination date announced in North Western's notice.

Denying the Milwaukee's motion for summary judgment and granting that of North Western, the district court found that the 1932 agreement specified no termination date and the court concluded that "in this jurisdiction . . . . [such a] contract . . . is terminable at the will of either party." Accordingly, because North Western had duly notified the Milwaukee of its intention to terminate the agreement, the court ordered the defendant railroad to deliver possession and enjoined it from any further use of the line. However, the court stayed "all further proceedings to restrain defendant" pending this appeal by the Milwaukee or the application by either party to the Interstate Commerce Commission.

I

North Western operates three main lines of railroad from Chicago. One extends in a westerly direction from Chicago through Proviso, Illinois, to Omaha, Nebraska; another extends in a northwesterly direction from Chicago through Des Plaines, Illinois, to St. Paul, Minnesota; and the third extends in a northerly direction from Chicago through Blodgett, Illinois, to Ishpeming Michigan. The 10½ mile section of line covered by the parties' 1932 agreement (the "Techny line")[2] is part of a railroad line running from Proviso through Des Plaines to Blodgett. Its use permits the railroads to expedite the handling of traffic. The Milwaukee claims that if it is foreclosed from using the

Techny line it would have to route its rail traffic to Milwaukee through downtown Chicago.

During the First World War, when the federal government assumed control of the nation's railroads, freight trains of the Milwaukee used North Western's Techny line. In 1920, with the approval of the Illinois Public Utilities Commission, the Milwaukee contracted with plaintiff for the continued use of the line. That agreement by its terms expired in 1928. North Western was reluctant to renew the right of the Milwaukee to use the tracks, particularly in a long-term contract. While the two railroads negotiated to determine whether they could reach a new agreement, they from time to time informally reaffirmed the arrangements that had been made in 1920.

The negotiations resulted in a new agreement, dated September 8, 1932. It provided, *inter alia,* for monthly payments based on 30¢ for each car and 60¢ for each locomotive moved by the Milwaukee over the Techny line. The instrument specified no termination date, and it contained no provision either for the escalation or the reduction of the compensation to be paid North Western. Plaintiff was not obligated to continue ownership, maintenance, improvement, or operation of the Techny line and related facilities. However, if North Western was to decide to abandon all or part of the line, the Milwaukee had the right to purchase it within 90 days. The parties also agreed that if they subsequently participated in the construction of tracks or additions in order to service nearby industries, each railroad would own an undivided one-half interest in such future side tracks. The final paragraph of the agreement specified that the instrument "shall not become effective until approved and authorized by such public authorities as may be required by law."

2. The North Western's brief states the line segment in question is commonly called the Des Plaines Valley Line. The nomenclature to be applied to the 10½ mile section of line is certainly one of the lesser problems of this litigation and one with which we shall not concern ourselves further.

The prayer to plaintiffs' complaint requested, *inter alia,* that the court (1) declare the agreement void pursuant to section 1(18) of the Interstate Commerce Act because the Interstate Commerce Commission had never approved it, (2) find the agreement terminable at will since it failed to provide a termination date, (3) declare the instrument unenforceable for lack of mutuality, and (4) enjoin the Milwaukee from using the line and from asserting any claims to it. The district court "chos[e] to focus upon the [issue of] the duration of the 1932 contract." [3]

## II

The district court did not reach or explore the ICC issue, the alleged basis of federal jurisdiction. Instead, it implicitly accepted pendent jurisdiction [4] over the nonfederal claims and, as we mentioned above, resolved the controversy on one of the state contract law grounds urged by North Western. Our examination of the law pertinent to the federal issues raised by this case convinces us

that the ICC ultimately will have to become involved in the Techny line trackage rights matter. That is, regardless of which party wins on state contract law grounds, [5] the ICC's expertise and approval are necessary for full resolution of the controversy. The district judge implicitly acknowledged the inevitable participation of the Commission when he stayed the injunction against the Milwaukee. Since, in our opinion, the jurisdiction of the ICC is the first issue that should have been resolved, we turn to it.

### A

A finding that North Western had the right under Illinois contract law to terminate its agreement with the Milwaukee raises the question whether the cessation of the Milwaukee's operations over the Techny line may be accomplished without the approval of the Interstate Commerce Commission. Whether such authorization is required depends upon the construction and applica-

3. The parties and the district court accepted Illinois law as controlling. The Milwaukee's main objection on appeal to the ruling of the court was that it failed to give sufficient weight to the materials the Milwaukee had submitted; they supposedly revealed the railroads' intent during the negotiations that culminated in the 1932 agreement. Under the Seventh Circuit's interpretation of Illinois law, it appears that the scope of the examination of extrinsic evidence in contract disputes is considerably greater than that traditionally recognized, at least where the court was of the opinion that there was no ambiguity. See Ortman v. Stanray Corp., 437 F.2d 231, 234–235 (7th Cir. 1971), reaffirmed in International Minerals & Chemical Corp. v. Husky Oil Co., 485 F.2d 153, 158 (7th Cir. 1973). *Cf.* Decatur Lumber & Mfg. Co. v. Crail, 350 Ill. 319, 323–324, 183 N.E. 228 (1932). For what seems to be the "modern" rule, see Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co., Inc., 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P. 2d 641 (1968), Annot., 40 A.L.R.3d 1384 (1971).

Although the court's memorandum opinion suggests that the court did consider the supplementary materials filed by the defendant, it did not discuss nor rule on the complex evidentiary questions presented by those ma-

terials. Nor did the court distinguish the case on which the Milwaukee placed greatest reliance, Illinois Central R. R. v. Michigan Central R. R., 18 Ill.App.2d 462, 152 N.E. 2d 627 (1958).

4. See United Mine Workers v. Gibbs, 383 U. S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ; *see generally* C. Wright, Federal Courts § 19 (2d ed. 1970) ; Comment, UMW v. Gibbs and Pendent Jurisdiction, 81 Harv. L.Rev. 657 (1968) ; Case Note, 81 Harv.L. Rev. 1580 (1968). As for North Western's prayer that the court "declare" the rights of the parties under their agreement, see Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 674, 70 S.Ct. 876, 94 L.Ed. 1194 (1950).

5. In addition to the basis on which the district court's decision rested, the only issue really presented in the original briefs in this appeal, the case also raised what we regard as a substantial mutuality question under state law. The Milwaukee, while having the right under its contract to use the trackage, did not commit itself to any particular usage thereof.

Although it was not argued at any juncture of this litigation, we also note that the agreement contained a provision for the arbitration of controversies arising out of the agreement.

tion of 49 U.S.C. § 1(18) which provides in pertinent part:

"[N]o carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

The primary decision involving this portion of section 1(18) is Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1946) (*Tex-Mex*). By written contract entered into in 1904, the Tex-Mex granted the St. Louis, Brownsville & Mexico Railway (Brownsville) the right, in return for payment of specified rentals, to operate its trains over Tex-Mex tracks and to make use of Tex-Mex terminal facilities. Both railroads were interstate carriers subject to the provisions of the Interstate Commerce Act. The contract provided for a term of 50 years unless the parties terminated it sooner. Either party was permitted, upon giving twelve months' notice, to terminate the lease. In 1940, seven years after the grantee railroad had petitioned for reorganization under § 77 of the Bankruptcy Act, Tex-Mex gave notice that it was exercising its right to terminate the contract. The trustee in the Brownsville bankruptcy proceeding, however, continued to operate trains over Tex-Mex lines and refused to pay more than the rental established by the contract. Tex-Mex thereupon brought suit in state court to enjoin the grantee and its trustee from using the tracks and to recover damages for such use. The state court denied an injunction, adjudged that the contract had been terminated, and awarded damages.

Although the United States Supreme Court granted certiorari mainly to clarify the relationship of the Bankruptcy Act with the Interstate Commerce Act, the Court's opinion does provide guidelines for the present case, which resembles *Tex-Mex* in crucial factual respects. We shall, therefore, quote the Court at length:

"[I]t [is] important that the *status quo* of this trackage agreement be maintained pending decision by the [Interstate Commerce] Commission as to the proper treatment of it in the reorganization plan. . . . [Moreover,] [t]he Commission has further functions to perform [apart from those under § 77.] [The Court then quoted the abandonment clause of § 1(18) of the Interstate Commerce Act.] . . . Whatever may be the powers of the Commission under the Interstate Commerce Act . . . over the terms of the trackage agreement . . ., it is clear that the Commission has jurisdiction over the operations. Sec. 1(18) embraces operations under trackage contracts, as well as other types of operations. . . . *Though the contract were terminated pursuant to its terms, a certificate would still be required under § 1(18).* Brownsville or its trustee could, of course, make the application for abandonment of operations. . . . Tex-Mex might [also] invoke the Commission's jurisdiction under § 1(18) and make application for abandonment of operations by Brownsville or its trustee. . . . The jurisdiction of the Commission is not restricted, however, to determining whether or no operations of Brownsville over the tracks of Tex-Mex should be abandoned. . . . Until abandonment is authorized [by the ICC], operations must continue. . . . The question of what would be the amount of a fair rental to be paid by Brownsville would be highly relevant to a decision by the Commission on the issue of abandonment. We conclude that at least in that situation the Commission has the power under § 5(2) to fix a reasonable rental. . . . Once the Commission has acted, the court may then proceed to enter judgment in conformity with the terms and conditions specified by

the Commission." *Id.* at 143–149, 66 S.Ct. at 946. (Emphasis added.)

In its final statement, the Supreme Court held that

"however the case may be viewed, *the court below should have stayed its hand and remitted the parties to the Commission for a determination of the administrative phases of the questions involved.* . . . *Until that time, judicial action is premature.* The judgment will be reversed and the cause remanded so that the case may be held pending the conclusion of appropriate administrative proceedings." *Id.* at 151, 66 S.Ct. at 947. (Emphases added.)

*Cf.* Smith v. Hoboken R. R., Warehouse & S. S. Connect. Co., 328 U.S. 123, 133, 66 S.Ct. 947, 953, 90 L.Ed. 1123 (1946), where the Court stated, "[T]he District Court erred in declaring the lease forfeited . . . . The District Court should stay its hand pending a decision by the Interstate Commerce Commission on the questions"; Warren v. Palmer, 310 U.S. 132, 137–138, 60 S.Ct. 865, 84 L.Ed. 1118 (1940).

North Western and the Milwaukee apparently agree that interstate traffic constitutes a substantial portion or perhaps even all of the Milwaukee's business carried over the Techny line.[6] This trackage, according to the agreement, is part of a North Western main line. *Cf.* New Orleans Terminal Co. v. Spencer, 366 F.2d 160 (5th Cir. 1966), cert. denied, 386 U.S. 942, 87 S.Ct. 974, 17 L. Ed.2d 873 (1967). Furthermore, the discontinuance of operations by the Milwaukee over the Techny line would seem to be within the meaning of "abandonment" as that term has been construed by the courts. *Cf.* City of Des Moines, Iowa v. Chicago & N. W. R. R., 264 F.2d 454, 458 (8th Cir. 1959); *contrast* City

of Alexandria, La. v. Chicago, Rock Island & Pacific R. R., 311 F.2d 7, 10, 12 (5th Cir. 1962), petition for reh. denied, 321 F.2d 822 (1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165. See also 49 C.F.R. Part 1121, esp. § 1121.1(p). The requisites for the applicability of section 1(18) and the *Tex-Mex* decision thus have been met. The significance or insignificance of the cessation of operations by the Milwaukee is a matter within the ICC's competence and domain. The federal district court should have the benefit of the agency's determinations on these administrative questions.

### B

■ North Western's complaint alleged that the jurisdiction of the federal district court was predicated upon subsections 1(18) and 1(20) of the Interstate Commerce Act, 49 U.S.C. §§ 1(18) and 1(20), and 28 U.S.C. § 1337.[7] When the two railroads executed their agreement in 1932, subsection 1(18) had provided in part:

"No carrier by railroad . . . shall . . . operate any line of railroad . . . unless and until there shall first have been obtained from the [Interstate Commerce] Commission a certificate that the present or future public convenience and necessity require or will require . . . operation . . . of such . . . line of railroad . . . ."

Subsection 1(20) states:

". . . Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) . . . of this section may be enjoined by any court of competent jurisdiction at the suit of . . . any party in interest . . . ."

---

**6.** North Western asserts that the Milwaukee has adequate alternative means of moving its traffic other than by using the Techny line. As we explain below, we believe that such an assessment is for the Interstate Commerce Commission first to make.

**7.** Section 1337 of the Judicial Code reads: "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce . . . ."

In memoranda submitted to the district court, North Western maintained that, under the above clauses of the Interstate Commerce Act, ICC authorization of the use of North Western's Techny line by the Milwaukee was needed. North Western called the court's attention to the final paragraph (27) of the 1932 agreement, which specifically referred to the obtaining of approval from public authorities. To the extent such action was required by law, North Western had further asserted that neither party to the 1932 agreement had obtained approval.

In support of its contention that ICC approval had never been obtained, North Western appended to its renewed motion for summary judgment "true copies" of two letters from the ICC to North Western's attorneys. The first letter, dated May 10, 1972, and written by the Deputy Director, Section of Finance, Office of Proceedings, Interstate Commerce Commission, on ICC stationery, stated that a "preliminary check" by the ICC had turned up no record of proceedings wherein the ICC had authorized the Milwaukee to operate over tracks between Bensenville and Techny, Illinois. The second letter, dated three months later and written by the Secretary of the ICC on official stationery, informed North Western that a "comprehensive search" had failed to disclose that the Milwaukee had been issued a Certificate of Public Convenience and Necessity to operate over North Western's Techny line.[8]

The Milwaukee's counterargument, presented to the district court, was that in 1932 the need for ICC approval of trackage rights agreements was uncertain. To support this contention, it cited several ICC decisions handed down shortly after the Transportation Act of 1920 had added subsection 1(18) to the Interstate Commerce Act of 1887. Those decisions supposedly revealed that the Commission narrowly interpreted its jurisdictional purview. The Milwaukee further asserted that it would be unfair for the district court to give retroactive effect to Transit Commission v. United States, 289 U.S. 121, 53 S.Ct. 536, 77 L. Ed. 1075 (1933), wherein the Court construed section 1(18) as granting the ICC jurisdiction over operations under trackage rights agreements. That opinion was not issued until six months after the Milwaukee and North Western had signed their contract.[9]

---

8. See 28 U.S.C. §§ 1732, 1733. The Secretary of the Interstate Commerce Commission is the custodian of various ICC files, including ICC reports and other ICC-issued documents and contracts, agreements, and arrangements between common carriers. 49 U.S.C. § 16(13) ; see also, e. g., 49 U.S.C. §§ 12(1), 14(3), 17(3) and (5), and 49 C. F.R. §§ 1001.1(d), 1120.2(b).

Prior to North Western's submission to the district court of these papers, the Milwaukee had attached an affidavit to its motion for summary judgment which stated that the Milwaukee's "General Attorney and Commerce Counsel" had caused a search of the Milwaukee's records to be made. The affidavit claimed that "such search [for evidence whether ICC authority had ever been obtained for the Milwaukee's use of the Techny line] has proven to be inconclusive as many of the involved company records of transactions at that time are no longer in existence and what few records are available are patently incomplete." The attorney-affiant further stated that "in his opinion the only reliable way to determine whether such Interstate Commerce Commission authority was obtained would be by a thorough examination of the [ICC's] records conducted by persons who are completely familiar with the Commission's record-keeping procedures."

9. The Milwaukee concedes that the ICC now plainly has jurisdiction over the approval, authorization, and terms of trackage rights agreements. See 49 U.S.C. § 5, par. (2)(a)(ii), which refers specifically to "trackage rights." That provision was part of a 1940 act amending the Interstate Commerce Act and giving the ICC new, explicit powers over trackage rights. In Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 146, 66 S.Ct. 937, 945, 90 L.Ed. 1132 (1946), the Supreme Court held that "[t]he authority of the Commission under § 5(2)(a) extends to fixing terms and conditions, including rentals, for any trackage agreements entered into subsequent to the effective date of the Transportation Act of 1940."

Our reading of the pre-1933 law yields a different conclusion, one, moreover, that does not depend upon giving retroactive effect to the Supreme Court's decision in the *Transit Commission* case.[10]

In June 1921, in Public-Convenience Certificate to A. & L. M. Ry., 67 ICC 781, 783 (1921) the Commission did state, as the Milwaukee maintained, that contracts granting only trackage rights do not fall within the jurisdiction conferred by section 1(18) and that, therefore, an ICC certificate for authority to exercise such trackage rights was unnecessary. The ICC reaffirmed this position two months later, in The Cleveland Passenger Terminal Case, 70 ICC 342, rev'd on other grounds upon rehearing, 70 ICC 659 (1921). By August 1922, the Commission was expressing its views more hesitantly, see Chesapeake & Ohio-Norfolk Western Trackage Rights, 72 ICC 471, 472 (1922). However, in Operation of Sherman, Shreveport & Southern R. R., 76 ICC 771, 773, decided in March 1923, the Commission returned to its original position.

The Milwaukee in its memorandum to the district court cited no ICC report subsequent to the *Sherman, Shreveport* of 1923. It thus ignored the further development of the Commission's thinking and the pre-1933 case law touching upon the Commission's jurisdiction under section 1(18). See the discussion in Transit Commission v. United States, 1 F. Supp. 595, 599 (S.D.N.Y.1932). See, e. g., Chicago & Alton R. R. v. Toledo, P. & W. R. R., 146 ICC 171, 179–81 (1928); Long Island R. R. Co. Trackage, 162 ICC 218, 220, 221 (1930), and 180 ICC 440, 446 (1932). In the latter matter, the same as that the Supreme Court later reviewed in *Transit Commission,* 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075 (1933), the New York Transit Commission and the State of New York

sought to have an order and certificate of the ICC set aside and annulled. The federal district court (by Judge Augustus Hand) denied the motions for a preliminary injunction and dismissed the petitions. It squarely held that, under section 1(18), the Interstate Commerce Commission and not the state Transit Commission had jurisdiction to pass on the railroads' trackage agreements. Transit Commission v. United States, *supra,* 1 F.Supp. at 598–599. Apparently the first judicial interpretation of section 1(18) directly on point, *Transit Commission* was handed down by the district court on October 3, 1932. The Milwaukee and North Western had signed their trackage rights agreement just several days earlier, on September 28th.

In sum, in 1932 the law on trackage rights was not the morass defendant had claimed it was. We can only speculate that, through an oversight, North Western, the Milwaukee, and their attorneys failed to take action in accordance with paragraph 27 of their agreement. And because both railroads until 1971 adhered to the agreement without conflict, the question of Interstate Commerce Commission involvement simply did not arise. Therefore, even if we were to assume *arguendo* that the Milwaukee's view of Illinois contract law is correct —that is, that the 1932 agreement was for a perpetual term—that would not obviate the necessity of having the parties and the Commission at this time rectify the past omissions.

### III

We conclude that inherent in the controversy between North Western and the Milwaukee are matters that must be examined by the Interstate Commerce Commission before a court may make a final, enforceable ruling. We, therefore,

10. We do note the following statement in Thompson v. Texas Mexican Ry. Co., *id.* at 144, 66 S.Ct. at 944: "[T]he fact that the trackage contract was entered into in 1904 prior to the passage of the Act [of 1920] is immaterial; the provisions of the Act, including § 1(18), are applicable to contracts made before as well as after its enactment." *Tex-Mex,* of course, was concerned with an attempted abandonment subsequent to the passage of the Act. See also *Transit Commission,* 289 U.S. at 129, 53 S.Ct. 536.

vacate the judgment entered in favor of North Western, remand the cause to the district court, and direct the court to stay further proceedings in the case, although leaving in effect its record-keeping requirement, until a determination or other disposition shall have been obtained from the ICC on the administrative. questions and considerations involved. The court may enter any facilitating orders it deems necessary to handle the case in accordance with our opinion, and shall reserve the power to terminate the pendency of the action or to make other appropriate disposition of it if circumstances warrant. *Cf.* City of Des Moines, Iowa v. Chicago & N. W. R. R., 264 F.2d 454, 459–460 (8th Cir. 1959).

Vacated and remanded.